OPINION OF THE JUSTICES TO THE HOUSE OF
REPRESENTATIVES.

*Insurance.* Savings bank life insurance, ° Commissioner of Insurance,
Surplus. *Commissioner of Insurance. Bank. Constitutional Law,* Equal
protection of laws, Police power, Impairment of contract. *Due Process
of Law,* Regulation of economic activity, Taking of property.

Proposed legislation to restructure the savings bank life insurance system by
establishing a corporation which would assume the assets and liabilities
of the insurance departments of all savings and insurance banks in the
Commonwealth was directed toward the accomplishment of a legitimate
public purpose, namely, providing the public with the opportunity to
obtain safe, low-cost life insurance. [1218-1219]
Provisions of proposed legislation to restructure the savings bank life insur-
ance system by creating a corporation to assume all of the assets and
liabilities of the insurance departments of savings and insurance banks
would not deprive the banks of any property rights without due process
of law since a bank's extremely tenuous right under existing statutes to
control the assets of its insurance department, other than the bank's
initial investment in the guaranty funds of that department, is not a
constitutionally protected property interest. [1219-1221]
Whatever constitutionally protected property rights a savings bank has in
the unretired portion of its initial investment in the guaranty funds of
the bank's insurance department would not be taken from it without due
process of law under proposed legislation creating a corporation to as-
sume all of the assets and liabilities of the insurance departments of
savings and insurance banks, where the bank's rights in these funds are
limited in nature and exist in the context of a pervasively regulated
industry and where, as a result of the proposed restructuring, the banks
would receive an interest in the newly-created corporation and, with it,
a potential ability to share directly in the profits generated by the operation
of the entire savings bank life insurance system. [1221-1224]
Provisions of proposed legislation creating a corporation to assume all of
the assets and liabilities of the insurance departments of savings and
insurance banks would not, by permitting the substitution of the corpo-
ration for particular savings banks without their policyholders' consent,
unconstitutionally impair the policyholders' contractual rights or deprive
them of any property rights under their contracts of insurance. [1224-
1226]

With respect to proposed legislation to form a corporation which would operate the savings bank life insurance system after assuming the assets and liabilities of the insurance department of every savings and insurance bank in the Commonwealth, no constitutional due process right of any savings bank, including those banks which elected not to participate in forming the corporation, would be abridged by provisions under which a majority of the banks were to determine whether and when the corporation would be formed and establish the allocation of capital stock in the corporation to each bank, where the proposed legislation required proceedings before the Commissioner of Insurance which assured adequate notice to all banks and where due process requirements would be satisfied by the injunctive and declaratory procedures available both to participating and nonparticipating banks for vindicating their rights in the allocation of the stock. [1226-1231]

Proposed legislation providing for a corporation which would operate the savings bank life insurance system after assuming the assets and liabilities of the insurance departments of all savings and insurance banks in the Commonwealth would not deprive the policyholders of any constitutionally protected property right in the aggregate surplus of any bank's insurance department as of the date of the assumption. [1231-1233]

On December 7, 1987, the Justices submitted the following answers to questions propounded to them by the House of Representatives.

To the Honorable the House of Representatives of the Commonwealth of Massachusetts:

The Justices of the Supreme Judicial Court respectfully submit these answers to the questions set forth in an order adopted by the House of Representatives on May 7, 1987, and transmitted to us on May 12, 1987.[1] The order recites that there is now pending before the General Court a bill, Senate No. 3 (S-3), entitled, "An act relative to savings bank powers." A copy of the bill was transmitted with the order. According to the order, the bill provides for a significant restructuring of the present savings bank life insurance system, whereby low-cost life insurance is provided through savings and insurance banks in accordance with the provisions of G. L. c. 178.

We summarize the principal features of the bill. Section 1 of the bill would insert a new G. L. c. 178A, which would

---

[1] We invited interested persons to file briefs on or before June 2, 1987. We acknowledge the assistance of a brief filed by the Division of Savings Bank Life Insurance and the Savings Bank Life Insurance Council.

provide, among other things, for the creation of the Savings Bank Life Insurance Company of Massachusetts (company) under a special charter for the purpose of selling life and accident and health insurance,[2] with all of the rights, powers and privileges and subject to all the duties, liabilities and restrictions of a domestic stock company formed under G. L. c. 175. Chapter 178A, § 2. The company would be created upon receipt by the Commissioner of Insurance (commissioner) of resolutions of the board of trustees and directors of a majority of savings and insurance banks electing to participate in the formation of the company. § 2. Each bank electing to participate would designate one of its directors or trustees to be named an incorporator of the company and to serve as a director of the company until such time as the stockholders duly elect successors thereto. § 4.

Within sixty days of its incorporation, the directors of the company shall submit to the commissioner a plan pursuant to which the company would "assume the ownership and operation of the insurance department of each savings and insurance bank, whether or not such savings and insurance bank shall have elected to participate in the formation of the company." § 5. This would not, however, foreclose savings and insurance banks from continuing to sell insurance. The plan would provide that "savings and insurance banks and savings banks and their respective officers and employees may act as agents and brokers exclusively" for the company in the sale of insurance

---

[2] Section 2 of the proposed c. 178A provides that the company would be incorporated "for the purposes of conducting life and accident and health insurance business only . . .." Other sections of c. 178A, however, appear to contemplate that the company may sell "life, annuity and accident and health insurance policies or contracts." §§ 1, 5. Section 9 provides that "[a]ll savings bank life insurance policies and annuities authorized for use by savings and insurance banks under the provisions of chapter 178 . . . shall be deemed approved for use by the company under the provisions of chapter 175." Amici, which include the sponsor of an earlier version of the bill now before us, state that "[t]he company would be created by special charter to conduct life, annuity and accident and health insurance business . . . ." For purposes of answering the questions submitted to us, we assume that the company would be able to continue to administer annuity contracts previously entered into by savings and insurance banks.

policies or contracts. §§ 1, 5. In addition, the plan would provide for the issuance of the capital stock of the company to each savings and insurance bank in a manner determined by the incorporators. § 5.[3]

The plan would further require that the company continue to treat as participating all policies of savings bank life insurance assumed by it. § 7. It also would provide for the payment of additional annual dividends on such assumed policies

> "in an amount equal to the total surplus of the company on the date of conversion multiplied by the net portfolio rate of interest earned by the company in the fiscal year prior to the year of distribution reduced by state and federal income taxes, if any, allocated to such amount. The payment of such additional dividends shall continue until the sum of all such additional dividends and allocated state and federal income taxes thereon equals the surplus of the company on the date of conversion. . . ."

§ 7.[4]

Within forty-five days of his receipt of the plan of assumption, the commissioner shall hold a public hearing, notice of which shall have been sent to each savings and insurance bank. § 8. The notice is to be accompanied by a summary of the plan which shall describe its effect on savings and insurance

---

[3] Section 5 of c. 178A provides in relevant part:

"The plan of assumption shall provide that each savings and insurance bank shall be issued shares of the capital stock of the company in such proportion as the surplus of the insurance department of such savings and insurance bank calculated at the fair market value of its assets bears to the total surplus of the insurance departments of all savings and insurance banks as of the December 31 immediately preceding the date of incorporation of the company or in such other manner that is deemed to be fair and equitable by the incorporators."

[4] Section 7 provides further that the commissioner, for good cause shown, may permit the company to defer payment of additional dividends in any year. It also makes provision, upon the liquidation of the company, for the distribution to such participating holders of in-force policies of the previously undistributed portion of the surplus at the time of conversion, after taking into account the income taxes thereon.

banks and on individual policyholders. "If the commissioner determines that the plan of assumption provides adequate protection for individual policyholders, he shall approve such plan and issue to the company, the certificate required by section 32 of chapter 175." § 8.

Upon the issuance to the company by the commissioner of a certificate required by G. L. c. 175, § 32, the company would immediately assume all of the assets (including any surplus), rights and interests and all of the obligations and liabilities of the insurance departments of all savings and insurance banks and of the Savings Bank Life Insurance Council, and the company simultaneously would issue shares of its capital stock to each such savings and insurance bank in accordance with the plan of assumption, "whereupon all operations of the insurance departments shall cease." §§ 5, 9. At the same time, the offices of the commissioner and deputy commissioner of savings bank life insurance, the State medical director and the State actuary, and the division of savings bank life insurance and the Savings Bank Life Insurance Council would be abolished, § 10, and the present c. 178 would be repealed, S-3, § 14.

The bill further provides that the presently existing General Insurance Guaranty Fund (Fund) (see G. L. c. 26, § 10; c. 178, § 14) shall continue its existence and shall exercise powers with respect to the company substantially identical to the powers which the Fund now exercises with respect to the insurance departments of savings and insurance banks under G. L. c. 178, §§ 18 and 18A. § 12.

Finally, the bill provides that the company may only distribute such dividends to its capital stockholders as the trustees of the Fund shall approve after reviewing the operations of the company and satisfying themselves that the company "is being operated soundly and that its expenses are consistent with the purpose of providing safe, low-cost life insurance." § 12. The commissioner "may veto any such approval if, after a hearing, he determines that the payment of such dividends would impair the company's financial stability or its ability to offer safe, low-cost life insurance." § 12.

The order recites that grave doubt exists as to the constitutionality of the bill if enacted into law and propounds the following questions:[5]

"1.) Would enactment of Sections 2 and 4 of S-3 which provide the method for the establishment of the Savings Bank Life Insurance Company of Massachusetts violate Articles I, X, XI and XII of Part First of the Constitution of the Commonwealth and the Fifth and Fourteenth Amendments to the Constitution of the United States by depriving individual savings and insurance banks, which have elected not to participate in the formation of the said Company, of property rights without due process of law by requiring them to be participants and to be without representation as incorporators and directors of the said Company?

"2.) Would the enactment of Section 5 of S-3 which requires the Savings Bank Life Insurance Company of Massachusetts to submit, within sixty days of its formation, a Plan of Assumption to the commissioner of insurance for his approval, in accordance with the provisions of Section 8 of said bill and based solely upon his determination that it provides adequate protection for individual policyholders, whereby the said Company would assume the ownership and operation of the insurance department of each savings and insurance bank, whether or not such bank has elected to participate in the formation of the said Company, violate Articles I, X, XI and XII of Part First of the Constitution of the Commonwealth and the Fifth and Fourteenth Amendments to the Constitution of the United States by depriving such banks of property rights without due process of law?

"3.) Would the enactment of said Section 5 which requires that the said Plan of Assumption provide for the issuance of shares of the capital stock of the Savings Bank

---

[5] From their context, it is clear that the references in the questions to various sections of S-3 are intended to refer to the sections of chapter 178A, which would be inserted by section 1 of S-3.

Life Insurance Company of Massachusetts to the said savings and insurance banks either on a formula basis, as contained therein, or in such other manner that is deemed to be fair and equitable by the incorporators, none of whom would be representatives of any such banks which elected not to participate in the formation of the Company, violate Articles I, X, XI and XII of Part First of the Constitution of the Commonwealth and the Fifth and Fourteenth Amendments to the Constitution of the United States?

"4.) Would enactment of Section 7 of S-3 which provides for the payment by the Savings Bank Life Insurance Company of Massachusetts to all individual policyholders of the aggregate surplus of the insurance departments of all savings and insurance banks as of the date of conversion into the said Company while permitting the said Company to retain the said surplus and to make such payments in the form of additional annual dividends at an undetermined annual net portfolio rate until such time as the aggregate amount of such additional annual dividends equals the amount of said surplus as of the date of conversion violate Articles I, X, XI and XII of Part First of the Constitution of the Commonwealth and the Fifth and Fourteenth Amendments to the Constitution of the United States by depriving the said policyholders of any property rights in said surplus without due process of law?

"5.) Would the enactment of Section 5 or Section 7 which provides for the assumption by the Savings Bank Life Insurance Company of Massachusetts of all savings bank life insurance policies and the requirement that the same be treated as participating policies by the said Company violate Articles I, X, XI and XII of Part First of the Constitution of the Commonwealth and Article 1, Section 10 and the Fifth and Fourteenth Amendments of the Constitution of the United States by the impairment of contract rights since it allows the substitution of the Savings Bank Life Insurance Company of Massachusetts for the appro-

priate savings and insurance bank without the policyhol-
der's consent and novation of contract?

"6.) Would the enactment of Section 9 of S-3 which
provides for the immediate assumption by the Savings
Bank Life Insurance Company of Massachusetts, upon
certification by the commissioner of insurance, of all of
the assets (including any surplus), rights and interests and
all of the obligations and liabilities of the insurance depart-
ments of savings and insurance banks and of the Savings
Bank Life Insurance Council violate Articles I, X, XI,
and XII of Part First of the Constitution of the Common-
wealth and the Fifth and Fourteenth Amendments to the
Constitution of the United States by depriving the
policyholders of such banks and the said banks of any
property rights without due process of law?"

*Discussion*

It will be convenient to address question 6 first, as that
question asks whether the end result sought to be achieved by
the bill — the assumption by a new Savings Bank Life Insurance
Company of Massachusetts of the assets, rights, interests, ob-
ligations, and liabilities of the insurance departments of savings
and insurance banks and of the Savings Bank Life Insurance
Council — would unconstitutionally deprive banks and
policyholders of their property rights without due process of
law. In connection with our discussion of policyholders' due
process rights, we shall also consider question 5, concerning
whether such an assumption unconstitutionally would impair
the contract rights of the policyholders. We will then address
the remaining questions.

We note that question 6, like most of the questions posed,
asks whether proposed c. 178A would deprive savings and
insurance banks or their policyholders of property rights with-
out due process of law under various provisions of our State
and Federal Constitutions. Under the Federal Constitution, a
preliminary inquiry is "'whether the statute bears a reasonable
relation to a permissible legislative objective.' *Pinnick* v.
*Cleary,* 360 Mass. 1, 14 (1971). Under the State Constitution
the issue is whether the statute 'bears a real and substantial

relation to the public health, safety, morals, or some other phase of the general welfare.' *Blue Hills Cemetery, Inc.* v. *Board of Registration in Embalming & Funeral Directing,* 379 Mass. 368, 373 (1979), quoting *Sperry & Hutchinson Co.* v. *Director of the Div. on the Necessaries of Life,* [307 Mass. 408, 418 (1940)]." *Decker* v. *Black & Decker Mfg. Co.,* 389 Mass. 35, 43 (1983). We can visualize possible legitimate public purposes for the legislation and, in the absence of a factual record establishing the lack of any conceivable rational basis for the legislation, we conclude that proposed S-3 would satisfy any constitutional requirement that it be directed toward a legitimate public purpose. Cf. *Commonwealth* v. *Henry's Drywall Co.,* 366 Mass. 539, 543-544 & n.5 (1974); *Opinion of the Justices,* 345 Mass. 780, 784-785 (1963).

We turn now to a major thrust of question 6: whether there would be an unconstitutional taking of property of banks if the proposed legislation were enacted. We first consider the nature of the interest of savings and insurance banks in the assets of their insurance departments. Only if the assets of a bank's insurance department could be considered the property of the bank could the bank claim any constitutionally protected right to such assets. Cf. *Employers' Commercial Union Ins. Co.* v. *Commissioner of Ins.,* 362 Mass 34, 39-40 (1972) (no unconstitutional taking or impairment of contract resulted from retroactive downward adjustment of premiums where premiums were provisional and subject to change). In order to determine this question, we must first analyze the present statutory provisions governing a bank's participation in the Massachusetts savings bank life insurance system.

Under present c. 178, most aspects of savings bank life insurance are strictly regulated. The operation of the savings bank life insurance system is overseen by the Commissioner of Insurance, the Commissioner of Banks and a gubernatorially appointed, seven member board of trustees of the General Insurance Guaranty Fund.[6] A savings bank wishing to sell savings bank life insurance must first establish a separate insur-

---

[6] Each trustee must be a trustee of a savings bank or of a savings and insurance bank. G. L. c. 26, § 10.

ance department, the assets of which "shall be liable for and applicable to the payment and satisfaction of the liabilities, obligations and expenses of the insurance department only." G. L. c. 178, § 8 (as amended through St. 1986, c. 569, § 1). The accounting and investment of those assets must be kept distinct from the accounting and investment of assets of the bank's savings department. § 8. The expenses of such an insurance department are subject to the review and approval of the State actuary, § 8, who in turn is appointed by the trustees of the General Insurance Guaranty Fund. G. L. c. 26, § 10. The net profits earned by the bank's insurance department each year, except for a portion thereof set apart as a surplus, are required annually to be distributed equitably among the holders of the insurance policies and annuity contracts issued by the bank. G. L. c. 178, § 21.[7] The State actuary also sets the premiums which banks may charge for insurance, dictates the standard form of policies and contracts which the banks must use, determines the amount which banks must set aside as reserves, and determines the net profits for the insurance department of each savings and insurance bank to be distributed to holders of policies and annuity contracts each year. G. L. c. 178, § 15. A State medical director, similarly appointed by the trustees of the Fund, G. L. c. 26, § 10, prescribes rules relating to health or acceptability of an applicant for insurance.

At the direction of the trustees of the Fund, participating banks contribute up to ten per cent of all premiums received by them each month to the Fund. The trustees hold such sums as a guaranty for the obligations of all savings and insurance banks on their respective policies and annuity contracts and may also use those funds in various ways to protect the integrity of the savings bank life insurance system. G. L. c. 178, §§ 18, 18A, 23. Chapter 178 also provides a mechanism for compensating for the extent to which each particular bank's mortality experience varies from that of all banks combined. G. L. c. 178, § 15. Thus, in large measure, the State's savings bank life insurance system already operates as a single entity.

---

[7] The limited purposes for which the surplus may be used are discussed below in connection with our response to question 4. See G. L. c. 178, § 21.

Until recently, about the only areas in which a savings and insurance bank retained any significant freedom of action consisted of the bank's determinations of which classes of insurance risks to accept, G. L. c. 178, § 6, how to invest the funds of the insurance department, G. L. c. 178, § 9, and, within specified limits, how much of the net profits in a given year would be set aside as surplus, G. L. c. 178, § 21. Recently, however, the statute was amended to authorize the trustees of the Fund to require participating banks to pay all or any portion of the funds of their insurance departments to the Savings Bank Life Insurance Council[8] for the purpose of making pooled investments for the benefit of such departments. G. L. c. 178, § 9 (as amended by St. 1986, c. 569, § 2, effective March 8, 1987).

Thus, generally speaking, savings and insurance banks presently have an extremely tenuous right to control the assets of their insurance departments and nothing approaching a constitutionally protected property interest in those assets. With the possible exception noted below, the assets of those insurance departments, including the net profits generated and the accumulated surplus, are devoted exclusively to the benefit of the policyholders.

However, in one respect not alluded to above, a savings and insurance bank might possibly be said to have an interest in the assets of its insurance department. Under present law, when a savings bank desires to establish an insurance department, it must set aside and place at the risk of such department at least twenty-five thousand dollars, which will be held in a special expense guaranty fund and special insurance guaranty fund. G. L. c. 178, §§ 3, 4, and 5. A bank's right to recover its "investment" (with interest) in these funds depends upon

---

[8] The Council is managed by the trustees of the Fund, with the advice of the incorporators of the Council, consisting of the treasurers (or other officers) of all savings and insurance banks. The Council may act to provide centralized services to savings and insurance banks and their policyholders and may act as agent for the receipt of funds and for making payments due under insurance policies and annuity contracts issued by any savings and insurance bank. The expenses of the Council are paid by the banks, and are apportioned among them by the trustees "in proportion to their premium income, or on such other basis as the trustees shall deem equitable and proper . . . ." G. L. c. 178, § 32 (1986 ed.).

the performance of the insurance department and is subject to regulatory approval. A bank whose guaranty funds have not been retired as provided in G. L. c. 178, §§ 4 and 5, would appear to have a stronger claim to repayment of its investment than to the assets of its insurance department generally. We need not resolve the exact strength of such a claim. We may assume, for purposes of answering the questions posed, that a bank would have a constitutionally protected property interest in the funds it has placed at the risk of its insurance department.[9]

For several reasons, a bank's potential property rights in the portion of the assets and liabilities of its insurance department representing the bank's investment in the guaranty funds established under G. L. c. 178, §§ 3, 4, and 5, would not be denied without due process of law if the company were to assume those assets and liabilities as provided for in proposed c. 178A, § 9.

---

[9] The present statute provides a means by which, subject to the approval of the State actuary, the expenses of a bank's insurance department may be paid out of premiums, fees and charges received. G. L. c. 178, §§ 4 and 8 (as amended by St. 1986, c. 569, § 1). Proposed c. 178A contemplates that the company will assume the ownership and operation of the insurance department and that, upon such assumption, all operations of the insurance department shall cease. Chapter 178A, §§ 5 and 9. Thereafter, by virtue of such cessation of operation, it would appear that a bank would have no reasonable basis for claiming any property right to continued receipt of such funds.

Prior to enactment of St. 1986, c. 569, § 1, a bank had the right to deposit the funds of its insurance department in its savings department. G. L. c. 178, § 9. Conceivably, a bank's savings department could make a profit on the funds so deposited which would not be subject to the restrictions of G. L. c. 178, § 21. As noted above, G. L. c. 178, § 9, was amended by St. 1986, c. 569, § 2, to provide that "all or any portion of the funds of the insurance department shall, at the discretion of the trustees of the General Insurance Guaranty Fund . . . be paid to the Savings Bank Life Insurance Council . . . for the purpose of making pooled investments for the benefit of such departments . . . ." The amendment would appear effectively to undercut any claim by a bank to a constitutionally protected property interest in the use of the funds of its insurance department. Cf. *Haverhill Manor, Inc.* v. *Commissioner of Pub. Welfare,* 368 Mass. 15, 23 ("The use of the funds, itself, is a property interest which may not be taken by the Commonwealth without due process of law" where the law of the Commonwealth creates a right to use of the funds), cert. denied, 423 U.S. 929 (1975). We express no views as to the constitutionality of the recent amendment to G. L. c. 178, § 9.

First, the savings bank life insurance system, and each bank's participation in it, has from the beginning been subject to pervasive regulation. As a result, participating banks are on notice that future legislation may alter their position. *Nationwide Mut. Ins. Co.* v. *Commissioner of Ins.*, 397 Mass. 416, 424 (1986). *American Mfrs. Mut. Ins. Co.* v. *Commissioner of Ins.*, 374 Mass. 181, 193-194 (1978). In these circumstances, a bank cannot claim any reasonable reliance upon continuation of regulatory provisions in force at any given point in time. In *Nationwide Mut. Ins., supra,* we upheld legislation which authorized the Commissioner of Insurance to establish commission rates for insurance agents higher than the rates specified in a contract between the insurer and its agents. Although we concluded that the legislation was intended to and did abrogate existing contract rights, we nevertheless concluded that the statute did not deprive the insurer of property without due process of law or unconstitutionally impair its contract rights. We based this conclusion upon the public interests which would be served by the legislation, on the limited nature of the insurer's contract rights in the context of a heavily regulated industry, and on the limited degree of impairment of the insurer's contractual rights.

The assumption of the assets and liabilities of each bank's insurance department contemplated by the proposed c. 178A is reasonable in the degree to which the bank's existing interest in its investment in its insurance department might be said to be impaired. The proposed statute does not provide that the bank's investment would be forfeited. Rather, the liability to repay that investment would be included among the liabilities assumed by the company when it assumes the assets and liabilities of all bank insurance departments.[10] Moreover, in return for giving up its insurance department, each participating bank will be issued stock in the company, which will carry with it voting rights and the possibility of future dividends. In this way, banks will acquire a potential ability to share directly

---

[10] Conceivably, the plan of assumption might provide for repayment of such investments at the time of the assumption.

in the profits generated by the operation of the savings bank life insurance system which they previously lacked. In these respects, the banks will have been given rights comparable to, and arguably greater than, any which they might lose as a result of the company's assumption of the assets and liabilities of their insurance departments. Cf. *Pinnick* v. *Cleary*, 360 Mass. 1, 15-27 (1971) (no-fault insurance law upheld as providing persons injured in automobile accidents with an adequate and reasonable substitute for preexisting rights).

We conclude, therefore, from a facial examination of the proposed statutory language, that the provisions in § 9 of proposed c. 178A, whereby the company would assume all of the assets and liabilities of the insurance departments of savings and insurance banks, would not deprive savings and insurance banks of property rights without due process of law.

We next consider whether policyholders would be deprived of property rights without due process of law by the company's assumption of the assets and liabilities of the bank insurance departments (question 6) and whether their contract rights would be unconstitutionally impaired (question 5) by virtue of the fact that the company would be substituted for the savings and insurance bank with which they had contracted without the policyholders' consent.[11]

---

[11] The relevant inquiries for resolving these two separate issues amount to much the same thing. See *Nationwide Mut. Ins. Co.* v. *Commissioner of Ins., supra* at 422 n.7; *American Mfrs. Mut. Ins. Co.* v. *Commissioner of Ins., supra* at 190. Therefore, the issues may be treated together. With respect to the principles applicable to assessing whether a given statute unconstitutionally would impair existing contract rights, we recently observed: "A statute is not per se unconstitutional merely because it has the effect of restricting, or barring altogether, the performance of contracts entered into prior to its [enactment]. . . . The Legislature may act pursuant to a valid exercise of its police power for the general good of the public, even though contracts previously entered into may be affected. . . . An impairment will be upheld if it is reasonable and necessary to serve an important public purpose. . . . Only those statutes which, on a balancing of opposing considerations, are deemed to be unreasonable will be held unconstitutional." (Citations omitted.) *Nationwide Mut. Ins. Co., supra* at 423. As we said in another case, "Private contract rights are subject to reasonable and necessary legislation in furtherance of important public interests, and legislative judgments concerning reasonableness and necessity

As in our analysis concerning the impact upon banks, *supra,* our focus as to the effect upon policyholders is a facial examination of the proposed statutory language.[12] In considering the nature of the property and contractual rights of the policyholders which might be affected, we note that, even under current law, the bank with which a policyholder may have contracted for insurance has the right unilaterally to discontinue its participation in the savings bank life insurance system and to reinsure its outstanding policies and annuity contracts in another savings and insurance bank, and to transfer the assets of its insurance department to such reinsuring savings and insurance bank. G. L. c. 178, § 25. In these circumstances, a policyholder would not have a reasonable expectation that there could be no substitution of another entity for the particular savings and insurance bank with which he or she had contracted without his or her consent. Cf. *Nationwide Mut. Ins. Co., supra* at 424.

It also appears unlikely that a policyholder would be materially disadvantaged by the change in entity with which he or she had an insurance contract. The new entity — the company — would assume all of the assets and liabilities of the insurance department of the bank involved, its operations would be subject to the supervision of the Fund in much the same manner as the operations of such insurance departments now are (compare G. L. c. 178, §§ 18 and 18A, with proposed c. 178A, § 12), and the Fund's assets and credit would continue to be available to ensure that the insurer's obligations under each policy or annuity contract would be met. Thus, the change in

---

are entitled to deference." *Attorney Gen.* v. *Travelers Ins. Co.,* 385 Mass. 598, 616 (1982), vacated 463 U.S. 1221 (1983), reaffirmed, 391 Mass. 730 (1984), aff'd sub nom. *Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U.S. 724 (1985). See *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.,* 459 U.S. 400, 410-413 (1983).

[12] We do not have before us any copies of life insurance policies or annuity contracts currently in use. Nor do we have the benefit of any findings as to whether there are considerations peculiar to certain banks which may have led consumers to choose to contract with those banks in particular. We think it unlikely that the contract language involved, or such considerations, would change the result of our analysis. On the present record, however, we cannot foreclose that possibility.

the contracting entity would not appear materially to impair the prospect that the insurer's obligations would be fulfilled.

Moreover, proposed c. 178A, § 7, would require the company "to continue to treat as participating all policies of savings bank life insurance assumed by it."[13] The fact that the size of the dividend an individual policyholder might receive might differ from that which the policyholder would have received if no assumption had occurred would not alter our conclusion, inasmuch as a policyholder has no statutory or contractual right to a dividend in a specified amount. Thus, the change in entity would not appear to affect the "core of . . . reasonable expectations" of policyholders. See *Opinion of the Justices,* 364 Mass. 847, 862 (1973).

Accordingly, we conclude that provisions of the bill which would permit the substitution of the company for a savings and insurance bank, without the policyholders' consent, would not amount to an unconstitutional impairment of the policyholders' contract rights. Nor would the concomitant assumption by the company of the assets and liabilities of all savings bank insurance departments deprive policyholders of property rights without due process of law.

Thus, we answer questions 5 and 6, "No."

Questions 1, 2, and 3 all appear to be directed to the provisions in proposed c. 178A by which a majority of savings and insurance banks would effectively be given the power (a) to cause the formation of the company, and thereby set in motion the restructuring of the savings bank life insurance system; and (b) to decide how the stock of the company would be allocated among all savings and insurance banks, including the minority of banks not represented among the directors of the company.[14]

---

[13] In this context, "[s]avings bank life insurance" refers to "policies or contracts of insurance, annuity contracts or other insurance products issued by a savings and insurance bank pursuant to chapter 178." Chapter 178A, § 1 (1986 ed.) (definitions).

[14] Under proposed c. 178A, §§ 2, 4, and 5, there appears to be a possibility that, unless resolutions from all banks wishing to participate in the formation of the company were received by the commissioner at the same time, some banks favoring participation in the formation of the company might nonethe-

In light of the banks' extremely limited interest in the assets of their insurance departments, as discussed above, we perceive, from a facial analysis of the proposed statutory language, no substantive due process infirmity in the Legislature's proposed choice of mechanism for determining whether and when the company would be formed, for preparing the plan of assumption, and for determining how much capital stock of the company would be allocated to each savings and insurance bank.

We think that the issues raised by question 1, 2, and 3 are whether the coercion of nonparticipating banks to be involved would violate due process rights; whether the procedure is fair and whether any property rights would be taken improperly; and whether there is a violation of due process in forcing a bank to join against its will in the way this statute indicates.

There are two aspects to the coercion issue: (a) the methodology by which the restructuring may occur and (b) how the capital stock will be divided. We think the Legislature could determine that the restructuring would occur, with-

---

less effectively be excluded from representation on the initial board of directors responsible for drafting the plan of assumption. Section 2 provides that the corporation (the company) "shall be created" upon receipt by the commissioner of resolutions from a majority of savings and insurance banks favoring participation in the formation of the company. Section 5 requires the directors of the corporation to submit a plan of assumption to the commissioner within sixty days of incorporation. Section 4 provides, "Each . . . bank electing to participate in the formation of the company shall designate one of its directors or trustees to be named as an incorporator of the company and to serve as a director until such time as the stockholders shall have duly elected successors thereto."

We need not resolve whether a savings and insurance bank which opposed the restructuring of the savings bank life insurance system contemplated by S-3, but which also desired to participate in the formation of the company and in the preparation of the plan of assumption in the event a majority of banks favored such restructuring, could (a) submit a formal resolution to the commissioner to that effect and thereby preserve a right to participate in the formation of the company if resolutions from a majority of banks favoring formation of the company were received, or (b) wait until just after the commissioner had received resolutions from a majority of banks electing to participate in the formation of the company before submitting a resolution electing so to participate, and thereby accomplish the same result.

out conditioning it upon a vote in favor by a majority of banks. That approach would be equally as "coercive" of banks opposing the restructuring as would the approach contemplated by the bill. Similarly, the Legislature could spell out exactly how the capital stock would be divided (i.e., the formula in § 5), without any mechanism for input from the banks. Had the Legislature done both of these things, no issue as to the fairness of allowing some banks to make decisions affecting other banks would be raised. Placing these decisions largely in the hands of some (or even all) of the banks does not raise a due process issue as to fairness. *Corning Glass Works* v. *Ann & Hope, Inc.*, 363 Mass. 409, 420-424 (1973), is relevant. There the court considered the validity of the nonsigner provision of a fair trade law, which allowed a manufacturer to enforce resale price contracts even against retailers who had not signed such contracts. The court ruled that the nonsigner provision did not violate the due process or equal protection clauses of the Federal Constitution and was within the Commonwealth's police power to enact, as limited by arts. 1, 7, 10 and 12 of the Declaration of Rights, notwithstanding arguments that the act's purpose was to protect private profits and eliminate competition and that there were less arbitrary methods of protecting distributors and trade mark owners. These were issues for the Legislature to resolve.

Questions 1, 2, and 3 may also be construed to ask whether the *procedural* due process rights of banks — particularly banks which have "elected not to participate in the formation of the Company" — would be violated by virtue of the fact that decisions affecting them would be made by the incorporators, none of whom would be representatives of such banks. While the meaning of question 2 is not entirely free from doubt, that question also appears to seek our views on whether the banks would be deprived of property rights without due process of law as a result of the fact that the commissioner would review the plan of assumption only to determine whether it provided adequate protection for individual policyholders. The question appears to focus upon the lack of review by the commissioner of the plan's proposed allocation of capital stock

of the company among the banks. The concern in all three questions appears to be that the incorporators who draft the plan might allocate the stock in a manner which is inequitable to the banks which did not elect to participate in the formation of the company and which, therefore, had no stay in how the stock was to be allocated.

"A claim of procedural due process presents two distinct issues. The first is whether due process applies at all. If it is found to apply, the second is concerned with the procedures required in the circumstances of the case. The first issue involves an analysis of the nature of the interest at stake. The second goes to the weight of that interest." *Lotto* v. *Commonwealth,* 369 Mass. 775, 777 (1976). In order to invoke the protection of due process, a property interest must rise to the level of an entitlement. *Allen* v. *Assessors of Granby,* 387 Mass. 117, 119-120 (1982). In this case, whether a bank's interest in the capital stock of the company amounts to an entitlement would depend upon the rules and understandings created by State law. *Id. Regents of State Colleges* v. *Roth,* 408 U.S. 564, 577 (1972).

A savings and insurance bank's right to some of the capital stock of the company would be created by proposed c. 178A, §§ 5, 6,[15] and 9. Sections 5 and 9, subject to the provisions of § 6, would give such banks a right to such shares in accordance either with the statutory formula discussed above (see note 3, *supra*) or with "such other manner that is deemed to be fair and equitable by the incorporators." Whether or not a bank may be said to have a property interest in shares of stock of the company which amounts to an entitlement is an issue we need not resolve. Cf. *Hathaway* v. *Commissioner of Ins.,* 379 Mass. 551, 554-555 (1980) (requirement that commissioner disapprove Blue Shield rates which are "excessive" may well create a legitimate claim of entitlement to rates which are

---

[15] Proposed c. 178A, § 6, would impose various restrictions upon the sale or transfer of the capital stock of the company and would provide that "[n]o single savings and insurance bank or savings bank or affiliated group of such banks may hold greater than 15% of the outstanding shares of such capital stock at any time."

not "excessive"). We conclude that, even if a bank could claim a constitutionally protected entitlement to an allocation of stock in the company, the procedures available for vindicating that right would meet the requirements of due process.

Even if, under proposed c. 178A, §§ 5 and 9, a bank would have a constitutionally protected property interest in a proper allocation of stock to it, the question would then arise, "'[W]hat process is due?' *Morrissey* v. *Brewer,* 408 U.S. 471, 481 (1972). Inquiry on this point requires the defining and weighing of competing interests stemming from the facts in each case." *Lotto* v. *Commonwealth, supra* at 780. *Haverhill Manor, Inc.* v. *Commissioner of Pub. Welfare,* 368 Mass. 15, 24-30 (1975). Where, as here, only property rights would be involved, the fact that a bank might not be afforded any sort of notice or hearing before the plan of incorporation was submitted to the commissioner would not amount to a denial of due process. See *Haverhill Manor, Inc., supra* at 27-28.

Proposed c. 178A, § 8, requires that within forty-five days of his receipt of the plan of assumption, the commissioner shall hold a public hearing. Notice of the hearing must be provided to each savings and insurance bank. The notice must "be accompanied by a summary of the plan of assumption which shall describe the effect of such plan of assumption on savings and insurance banks and on individual policyholders." Chapter 178A, § 8. Although according to § 8 and question 2, the commissioner would base his approval of the plan "solely upon his determination that it provides adequate protection for individual policyholders" (question 2), these provisions would effectively provide banks with notice of how the proposed plan of assumption would affect them. Thereafter, any bank which believed that its statutorily conferred (or constitutional) rights would be denied by the plan could institute an action for declaratory and injunctive relief under G. L. c. 231A. In such a declaratory judgment proceeding, a bank "would receive a plenary judicial hearing of the factual and legal bases for its grievance. The availability of this hearing satisfies [any potential] constitutional requirement that some opportunity for a hearing must be afforded before the deprivation of property

becomes final." *Haverhill Manor, Inc., supra* at 30. See *Roslindale Coop. Bank* v. *Greenwald,* 638 F.2d 258, 260-261 (1st. Cir.), cert. denied, 454 U.S. 831 (1981). In light of the availability of relief under G. L. c. 231A, the fact that there is no provision in c. 178A for any administrative review of the fairness to banks of the stock allocation contemplated by the plan of assumption would not abridge any constitutional right of the banks. See *Haverhill Manor, Inc., supra* at 29 n.19.

In view of the foregoing discussion, we answer questions 1, 2, and 3, "No."

Question 4 asks whether § 7 of c. 178A, which provides for the payment by the company to policyholders, all at once or over a period of years, of the aggregate surplus of the banks' insurance departments as of the date of conversion, would deprive the policy holders of any property rights in said surplus without due process of law.

The surplus in this context represents an amount set aside annually "from the net profits, if any, which have been earned in [a bank's] insurance department . . .." G. L. c. 178, § 21. The amount which may be so set aside is limited by statute, although, in certain instances, deviations from those limits may occur if the State actuary approves. § 21. More important for present purposes are the uses to which the surplus may be put.

> "Such surplus shall be maintained and held or used so far as necessary to meet losses in [a bank's] insurance department whether from unexpectedly great mortality, depreciation in its securities, or otherwise, and, after said surplus amounts to twenty thousand dollars, for the maintenance of a stable dividend scale, and for the payment of settlement or maturity dividends or both in such manner and in such amounts if any, as may from time to time be directed by the state actuary."

G. L. c. 178, § 21. The surplus, then, acts as a sort of monetary cushion which may be drawn upon by the insurance department for certain specified purposes. Although those purposes include maintenance of a stable dividend scale — which in this context

refers to dividends to be paid to policyholders — there is no requirement that the surplus ever be used for that purpose.[16]

In *White Fuel Corp.* v. *Liberty Mutual Ins. Co.*, 313 Mass. 165 (1943), we rejected a claim by a policyholder of a mutual insurance company to a pro rata share of profits accumulated and set aside as a surplus, where the applicable statutes permitted the accumulation of such a surplus and provided that "such accumulation may be used from time to time in the payment of losses, dividends and expenses." *Id.* at 167. The court held that the defendant insurance company could "accumulate in addition to the calculated policy reserves, surplus funds for the general strengthening of the company, for which funds it is not obligated to account to those who were policyholders during the period of accumulation." *Id.* In relevant respects, the present statutory provisions regulating the accumulation of a surplus by savings and insurance banks are analogous to those construed in *White Fuel Corp.* Thus, although in some sense policyholders may be considered the equitable owners of a bank's surplus, 18 J. Appleman, Insurance Law and Practice 148 (1945), they normally would have no right to require it or any portion of it to be returned to them.

Assuming, arguendo, that policyholders could claim a property interest in the surplus which would rise to the level of an entitlement, § 7 of proposed c. 178A, by requiring the return to policyholders of the surplus at the time of conversion, would appear to strengthen, rather than in any way impair, whatever interest policyholders might be considered to have in the surplus. Therefore, the facts that that return would be accomplished "in the form of additional annual dividends at an undetermined annual net portfolio rate," and that the company

---

[16] General Laws c. 178, § 21, further provides that the balance of the net profits — i.e., those not set aside as part of the surplus — "shall annually be distributed equitably among the holders of [the bank's] insurance policies and annuity contracts . . . ." Thus, by statute, the surplus represents amounts specifically excluded from the funds which must be distributed among policyholders.

might be permitted to defer payment of such additional dividends in any year if the Commissioner permits it, for good cause shown, would not appear to deprive policyholders of any property rights in the surplus. We observe, additionally, that these provisions could be conceived to be rationally related to the goal of providing a financially sound method for ensuring the availability of low-cost insurance for the public.

We, therefore, answer question 4 "No."

*Conclusion*

In summary, we answer all six reported questions, "No."

The foregoing answers are submitted by the Chief Justice and the Associate Justices subscribing hereto on the 7th day of December, 1987.

EDWARD F. HENNESSEY
HERBERT P. WILKINS
PAUL J. LIACOS
RUTH I. ABRAMS
JOSEPH R. NOLAN
NEIL L. LYNCH
FRANCIS P. O'CONNOR