RICHARD GOLDSTEIN & others[1] *vs.* SAVINGS BANK LIFE
INSURANCE COMPANY OF MASSACHUSETTS.

Suffolk. December 4, 2001. - February 4, 2002.

Present: GREANEY, IRELAND, SPINA, SOSMAN, & CORDY, JJ.

*Insurance,* Savings bank life insurance, Savings bank life insurance company,
Surplus, Commissioner of Insurance.

The Savings Bank Life Insurance Company of Massachusetts, in calculating
the safety fund permitted by G. L. c. 175, § 141, may apportion about
forty per cent of the value of its original surplus to the stockholders'
ownership interests. [766-769]

The Savings Bank Life Insurance Company of Massachusetts, in calculating
the safety fund permitted by G. L. c. 175, § 141, may deduct annually
from its surplus an amount equal to the present value of those special
policyholder dividends called for by G. L. c. 178A, § 5, that remain to be
paid out of the company's original surplus. [769-771]

CIVIL ACTION commenced in the Superior Court Department on
May 7, 1998.

A motion for summary judgment was heard by *Allan van
Gestel,* J., and questions of law were reported to the Appeals
Court by him.

The Supreme Judicial Court granted an application for direct
appellate review.

*Jason B. Adkins (Max D. Stern* with him) for the plaintiffs.

*Thomas F. Maffei (Mona M. Patel* with him) for the defendant.

The following submitted briefs for amici curiae:

*William F. Kennedy, Daniel P. Olohan, & Elin M. Dugan* for
Life Insurance Association of Massachusetts.

*Jonathan M. Feigenbaum* for Consumer Federation of
America & another.

---

[1]Peter Hale, Barbara J. Sullivan, and Loretta Harhen, individually and on
behalf of owners of life insurance policies issued by the defendant, Savings
Bank Life Insurance Company of Massachusetts (SBLIC).

GREANEY, J. A judge in the Superior Court reported to the Appeals Court two questions of law after he allowed part of a motion for summary judgment filed by the defendant, Savings Bank Life Insurance Company of Massachusetts (SBLIC), see G. L. c. 231, § 111; Mass. R. Civ. P. 64 (a), as amended, 423 Mass. 1403 (1996). SBLIC filed the motion for summary judgment in response to a class action to compel SBLIC to pay out as dividends to its policyholders surplus funds (claimed to be approximately fifty-seven million dollars) that the plaintiffs contend SBLIC has improperly accumulated and retained, in violation of G. L. c. 175, §§ 140 and 141, since its inception in 1992.[2] SBLIC asserts that it is entitled to adjust its surplus by two financial items ([1] the value of stockholder equity and [2] the present value of unpaid special policyholder dividends) created by G. L. c. 178A, as part of the legislative reorganization of the savings bank life insurance system in 1992, and that, so adjusted, its retained surplus does not exceed the statutory limit. The judge allowed SBLIC's motion for summary judgment to the extent of ruling that the two deductions are permitted, but made no determination as to their amount (those matters being factual, material, and contested). The judge then reported the following questions:

"1. Whether, in calculating the safety fund permitted by G. L. c. 175, [§] 141, [SBLIC] annually may deduct from its surplus an amount equal to [forty per cent] of the company's assumed surplus at the date it began operations under the Plan of Assumption on January 1, 1992?

"2. Whether, in calculating the safety fund permitted by G. L. c. 175, [§] 141, [SBLIC] annually may deduct from its surplus an amount equal to the present value of those special policyholder dividends called for by G. L. c. 178A, [§] 5, that remain to be paid out of the company's assumed surplus at the date it began operations under the Plan of Assumption on January 1, 1992?"

[2]The plaintiffs' second amended complaint alleges (1) breach of contract; (2) breach of fiduciary duty; (3) tort claims for unjust enrichment, imposition of a constructive trust, and money had and received; and (4) violation of G. L. c. 93A, § 2.

We allowed SBLIC's application for direct appellate review and now address the issues presented by the reported questions.

1. The following background is helpful. In 1992, the Massachusetts savings bank life insurance (SBLI) system, devised by Louis D. Brandeis, adopted in 1907 (St. 1907, c. 561), and later codified at G. L. c. 178 (repealed by St. 1990, c. 499, § 22), was replaced, pursuant to G. L. c. 178A (inserted by St. 1990, c. 499, § 23), by a new system of savings bank life insurance.[3] *DiBiase* v. *Commissioner of Ins.*, 428 Mass. 755, 755-756 (1999). Under the reorganization, the individual insurance departments of savings and insurance banks that comprised the SBLI system were replaced by a single domestic stock life insurance company, SBLIC. See G. L. c. 178A, § 2. SBLIC assumed all assets, including any surplus, rights, and interests; and all of the obligations and liabilities of the insurance departments of the former savings and insurance banks. See G. L. c. 178A, § 7.

To the savings and insurance banks, the Legislature directed that shares of SBLIC capital stock be issued:

> "in such proportion as the surplus of the insurance department of each such bank . . . bears to the total surplus of the insurance departments of all such banks as of the date of conversion, or in such other manner deemed to be fair and equitable by the directors and approved by the commissioner."

G. L. c. 178A, § 4. Each bank was to designate one of its directors or trustees to be an incorporator of SBLIC and to serve as a director of the company. See G. L. c. 178A, § 3. Regardless of its proportion of stock ownership, each bank was to have only one voting share. See G. L. c. 178A, § 4.

To the individual policyholders under the SBLI system as of the date of conversion, the Legislature directed that an amount

---

[3]In 1987, this court answered questions submitted by the House of Representatives concerning the proposed repeal of G. L. c. 178 and the enactment of a proposed bill providing for the creation of a domestic stock insurance company to replace the existing savings bank life insurance system. See *Opinion of the Justices*, 401 Mass. 1211, 1213, 1215 (1987). The bill then pending before the Legislature was not the same as the bill eventually enacted in 1990. *DiBiase* v. *Commissioner of Ins.*, 428 Mass. 755, 757 (1999).

equal to the total surplus assumed by SBLIC be distributed, over time, as additional annual dividends (special policyholder dividends). See G. L. c. 178A, § 5. According to § 5, distribution was to be made:

> "over a period of not less than eight nor more than twelve years in accordance with a schedule prepared by [SBLIC] and approved by the commissioner [of insurance] and shall continue until the sum so distributed equals the amount of said surplus on said date of conversion."

The distributions were to be made without interest, except that in the year following the payment of the final dividend, an additional payment amount was to be paid representing one year's interest on the total distributions. *Id.* In addition, the Legislature directed that "[t]he amount of surplus so distributed shall be considered as an expense in determining the net profits of [SBLIC]." *Id.*

The Legislature established a policyholders protective board (PPB) (consisting of seven members appointed by the Governor from policyholders of savings bank life insurance) to review the financial operations of SBLIC and make recommendations to the directors to ensure SBLIC's ability to offer "safe, low cost insurance." G. L. c. 178A, § 9.[4] The Legislature provided that no dividends may be paid to the stockholder savings banks without the approval of the PPB and the Commissioner of Insurance (commissioner). G. L. c. 178A, § 10.[5]

The Legislature specifically designated that the details of the

---

[4] Section 9 provides that "[c]opies of such recommendations shall be filed with the commissioner and the executive office of consumer affairs and business regulation. Except as provided above, the directors of the [PPB] shall have the right to attend meetings of the board of [SBLIC] and to participate therein but shall not have a vote on any actions taken by said directors of [SBLIC]."

[5] Section 10 provides in relevant part:

"[SBLIC] may distribute to its stockholders only such dividends with respect to its capital stock as the directors of [SBLIC] and the [PPB] shall approve. Prior to granting any such approval, [the PPB] shall review the operations of [SBLIC] and if it finds that the company is being operated soundly and that its expenses, earnings and mortality are consistent with the company's purpose of providing safe, low cost insurance, it shall approve such dividends and report its findings, together with the reasons therefor, to the commissioner. The commissioner shall consider the report of the [PPB]

reorganization were to be carried out in accordance with a plan, to be submitted by SBLIC to the commissioner. See G. L. c. 178A, § 4 ("Within forty-five days after the establishment of [SBLIC], the directors shall submit to the commissioner a plan pursuant to which [SBLIC] shall assume the ownership and operation of the insurance department of each savings and insurance bank"). On receipt of the plan, the commissioner was to issue notice and hold a public hearing within forty-five days, after which, if she "determine[d] that the plan of assumption conforms to the requirements of [G. L. c. 178A], [she] shall approve said plan and issue to the company the certificate required by [G. L. c. 175, § 32,] to be effective as of the close of business on [December 31, 1991]." G. L. c. 178A, § 6. Such a plan was submitted and approved by the commissioner, after notice and a public hearing, in conformance with the statute. See *DiBiase* v. *Commissioner of Ins.*, 428 Mass. 755, 759 (1999). The plan outlined the operating strategy for the conversion[6] and included, among other matters, a method for valuation of each bank's contribution to the total assumed surplus, to ensure the fair distribution of SBLIC capital stock, as mandated by § 4, and a schedule for distribution of the special policyholder dividends, as mandated by § 5. These plan provisions will be discussed later in this opinion.

In addition to the statutory requirements of G. L. c. 178A, SBLIC, as a domestic stock insurance company, must conform to requirements contained in G. L. c. 175. See G. L. c. 178A, § 2 (SBLIC "shall have all the rights, powers and privileges

and may, after notice and hearing if [she] deems the same to be necessary, veto any such approval if [she] determines that the payment of such dividends would impair the financial stability of [SBLIC] or its ability to offer safe, low cost insurance."

[6]According to the plan, SBLIC was to provide "low cost life insurance, supported by a sound financial condition," with sales to (then) existing SBLI and savings bank customers. Efficiencies gained by replacing the approximately sixty individual savings bank insurance departments in the SBLI system with a single stock life insurance company were to be used to maintain "low cost insurance and a strong financial position." Once the assets, surplus, rights, interests, obligations, and liabilities of the insurance departments were transferred to SBLIC, as provided for in G. L. c. 178A, § 7, the insurance departments were to be closed, and any pending actions and all existing insurance contracts were continued through substitution of SBLIC for the insurance departments.

and be subject to all the duties, liabilities and restrictions of a domestic stock insurance company established under [G. L. c. 175], except as otherwise provided herein"). The following two provisions of G. L. c. 175 are relevant to the issues we are asked to decide.

Section 140 requires every domestic life insurance company, including SBLIC, to ascertain and distribute its surplus (or profits) to policyholders annually. Specifically, § 140 provides that each company:

> "[A]fter providing from the funds attributable to its participating business for the reserve required by [§§ 9 and 11][7] and all other liabilities attributable to such business, including dividends declared upon the capital stock, if any, and such sum as may be held on account of existing deferred dividend policies, and providing also for a contingency reserve not in excess of the limit prescribed in [§ 141], apportion its remaining funds attributable to such business upon the contribution to surplus plan, as dividends, to all other policies entitled to share therein."

Not all of the surplus, however, must be so distributed. Section 141 permits an insurer to retain from its surplus attributable to its participating business[8] "as a safety fund, an amount not in excess of twelve per cent of its reserve for such business . . . provided that for cause shown, the commissioner may . . . permit any company to accumulate and maintain a safety fund in excess of the limit above mentioned." Under G. L. c. 175, §§ 140 and 141, thus, SBLIC is permitted to retain from its surplus funds a contingency reserve or safety fund, equal in amount to no more than twelve per cent of its reserve funds. Anything over that amount is required to be distributed to policyholders in an annual dividend (unless the commissioner,

---

[7]General Laws c. 175, § 9, provides for the computation of reserves and § 11 provides for the computation of assets and liabilities, and requires reserves, as calculated under § 9, as well as all unpaid losses and claims for losses, and all other debts and liabilities, including its capital stock, to be designated as liabilities.

[8]A "participating" policy is one that entitles the holder to a share in the insurer's profits. All of the insurance policies sold by SBLIC are participating policies.

for cause shown, has permitted accumulation in excess of this amount).

2. We briefly summarize the controversy. The plaintiffs contend that, since its creation in 1992, SBLIC has added to its original surplus, without a waiver by the commissioner, and that its surplus-to-reserve ratio is far in excess of the twelve per cent maximum allowed by G. L. c. 175, § 141. The plaintiffs charge that SBLIC's directors have abused their power, using it, not toward the Legislature's goal to provide "safe low cost" insurance to policyholders, but, instead, to provide "reasonable, long-term returns to stockholders" and to build "franchise value."[9] The result of their manipulations, according to the plaintiffs, has been a "bloated surplus of nearly [nineteen per cent] of its reserves, far more than other insurers and far exceeding what even SBLIC's own management says it needs."

SBLIC responds that its retained surplus does not violate the statutory limit, because it is entitled to adjust its surplus by two amounts mandated by G. L. c. 178A: (1) the value of the stockholder banks' equity interest in SBLIC, represented by their shares of capital stock (which SBLIC claims to be approximately forty per cent of the original surplus); and (2) the present value of the special policyholder dividends that remain to be paid. SBLIC asserts that, so adjusted, its surplus falls well below the statutory limit.

The judge agreed that SBLIC was entitled to the two deductions, but made no ruling as to the accuracy or correctness of the parties' respective calculations of the original assumed surplus; the value of the shareholder equity; or the present value of the remaining special dividend throughout the period from 1991 to date.

3. a. The first question for our consideration is whether SBLIC is entitled to deduct from its surplus an amount which the judge styled "equal to [forty per cent]" of the original surplus attributable to shareholder banks.

[9]The plaintiffs assert that, after this lawsuit was filed, a committee of SBLIC executives proposed various accounting schemes to "burn up" surplus, and "[i]ncrease[e] the risk in [SBLIC's] investment portfolio," so SBLIC's assets could be reported differently (and not as surplus), including a legislative change to allow "stockholder equity" to be excluded from excess surplus calculations under G. L. c. 175, § 141.

We begin with the premise that, by granting SBLIC capital stock to the savings and insurance banks under the SBLI system, the Legislature clearly intended to grant the banks some measure of ownership interest in SBLIC, in exchange for SBLIC's assumption of the assets of the bank's insurance departments. See G. L. c. 178A, § 4 (providing for issuance of capital stock in relative proportion to each bank's surplus). This premise is supported by the fact that the value of original surplus (assumed by SBLIC from the insurance departments of the savings and insurance banks) was to be distributed over an eight to twelve year period, without interest (until the year following the final payment). The immediate effect of this distribution method was to provide SBLIC with the capital needed to begin its operation. (Indeed, the statutory scheme provided for no other additional capital infusion and no additional stock issues.) The long-term effect of this distribution method, of which the Legislature undoubtedly was aware, was to transfer only a portion of the original surplus to policyholders in the form of special dividends. That portion not eventually distributed to the policyholders, logically, represents that amount of the original surplus intended by the Legislature to represent the interests of SBLIC's stockholders, the savings and insurance banks.[10]

Language contained in the plan supports this view. "The distribution formula [for the special policyholder dividends] . . . recognizes that the savings and insurance banks that established and maintained the insurance departments[] contributed initial capitalization and subsidized expenses of the departments until they became self-supporting ([fifteen to twenty] years)."[11] The schedule for distribution was, according to the plan, a method of raising capital for the new enterprise,

[10]There is no support for the plaintiffs' assertion that the Legislature, in allocating shares of SBLIC capital stock to the savings and insurance banks, intended their interest to be a solely fiduciary one.

[11]Although G. L. c. 178, § 8 (since repealed), had required that the finances of a savings bank be kept separate from those of its insurance department, nothing in § 8 prohibited indirect subsidies in the form of shared overhead. According to the plan of assumption, "[t]he subsidization of the insurance departments by the savings departments of the banks was the subject of continuing supervision by the Division of Savings Bank Life Insurance as part of its oversight function, and subject to regular examination by the Division of Insurance and the Division of Banks."

and it stated that, "SBLIC must plan on living on its existing capital and annual profit to support growth for the foreseeable future."

The statute is silent on the exact portion of the original surplus attributable to the banks. The plan, however, states that "[t]he legislated method of surplus distribution under [G. L. c. 178A, § 5,] was intended to provide about [sixty per cent] of the present value of the combined surplus to policyholders and about [forty per cent] of the surplus to the shareholder banks, to represent their unreimbursed contributions."[12] We find this language persuasive and conclude that SBLIC may apportion about forty per cent[13] of the value of its original surplus to the stockholders' ownership interests.[14]

The plaintiffs would have us dismiss the above language as "incorrect dicta" that was "never adjudicated" by the commissioner. An adjudicatory hearing was not necessary. See *DiBiase* v. *Commissioner of Ins.*, 428 Mass. 755, 757 (1999). The commissioner approved the plan, as required by statute, after a public hearing on the question whether it conformed to the legislative mandates of G. L. c. 178A, § 6. It is too late for the plaintiffs to challenge the nature and terms of the plan. See

---

[12]According to SBLIC, the original source for determining the forty per cent figure as the approximate amount of the stockholders' interest in the original surplus, was a study done by Wolf & Company, analyzing costs (including rent, heat, light, personnel, and other overhead items) incurred by banks that began and maintained life insurance departments and calculating the value of certain indirect subsidies provided by the banks. This information was presented to both the Legislature and the commissioner, in the form of an SBLI expense subsidy report, during the reorganization process.

[13]Although, as previously stated, the judge referred to this amount as exactly forty per cent, the plan, on which we must rely, states "about" forty per cent. We are reluctant, on this record, to quantify the precise percentage of original surplus that is attributable to stockholder equity. An exact figure should be determined, in accordance with the general directive of the plan (which established it at "about" forty per cent), by the Superior Court.

[14]The liquidation provision of G. L. c. 178A, § 5 ("In the event of a complete liquidation of [SBLIC], there shall be distributed to individual policyholders an amount equal to the difference, if any, between the surplus assumed by [SBLIC] on the effective date of conversion and the sum of such previously distributed amounts"), does not persuade us otherwise. This provision ensures that policyholders have a statutory right to receive that portion of the surplus due to them, in circumstances where that entitlement might otherwise be in jeopardy.

*id.* at 757-759. The plan, thus, is controlling. See *Massachusetts Motor Vehicle Reinsurance Facility* v. *Commissioner of Ins.*, 379 Mass. 527, 530, 536-539 (1980) (plan approved by commissioner governed operation of facility).

Permitting this deduction accords with the legislative purpose underlying G. L. c. 175, § 140, to benefit, by way of the payments of dividends, those participating policyholders of a life insurance company who have contributed, by the payment of premiums, to the company's surplus. The unambiguous language of § 140 allows for adjustments and deductions to its surplus "attributable to its participating business." Because the initial contributions of the savings and insurance banks to SBLIC at the time of conversion is not "attributable to [SBLIC's] participating business," it is not required to be paid to current policyholders under G. L. c. 175, § 140. Relevant here as well is the fact that the capital stock of a stock insurance company is defined as a liability under G. L. c. 175, § 11, and, as such, is properly deducted from surplus as an adjustment for "all other liabilities attributable to such business," under G. L. c. 175, § 140.

b. The second reported question asks whether SBLIC is entitled to deduct the present value of unpaid special policyholder dividends.[15]

An amount equal to the original surplus assumed by SBLIC was earmarked by the Legislature to be paid to policyholders at the time of conversion. These funds were committed to a specific purpose and, unquestionably, may be deducted from surplus under G. L. c. 175, § 140, which allows deductions for "all . . . liabilities attributable to [its participating] business." This amount is treated as a deduction in the plan, which contains financial projections of SBLIC's expected surplus, over a period of fifteen years. The projections demonstrated its ability to provide low cost life insurance, while continuing to pay the special policyholder dividends from its earnings, and specifically include annual adjustments to the surplus for the special policyholder dividends.

---

[15]SBLIC asserts, and the plaintiffs do not argue otherwise, that it has paid these special dividends annually since 1992.

We reject the plaintiffs' contention that the special policy-holder dividends are not liabilities until after they are paid.[16] To accept this argument would have the effect of SBLIC's paying out the original surplus twice — once as a portion of the surplus required to be distributed under G. L. c. 175, § 141, and again as special policyholder dividends as they are paid under G. L. c. 178A, § 5.

The plaintiffs contend that SBLIC has not treated these dividends as a liability on any of its annual statements filed with insurance regulators in Massachusetts or nationally, and that allowing SBLIC, in effect, to keep "two sets of books" would "undermine the uniform statutory scheme designed to assure transparency and uniformity in financial reporting and adversely affect millions of insurance consumers nationwide" and "permit other insurers to seek to reduce policyholders' dividends (or take other actions) based on off-balance sheet 'liabilities' the insurer nowhere reported in the past and will never report."

The plaintiffs' fears are exaggerated. Of all the participating life insurers in Massachusetts, SBLIC alone is required to conform to both G. L. c. 175 and G. L. c. 178A, and, thus, the circumstances of this case are unique.[17] The Legislature sought, in essence, to balance the interests of SBLIC's stockholders and its policyholders, by granting the former the right to participate in management and in the company's ongoing profits, but restricting those rights in a manner not applicable to other stock insurance companies. See G. L. c. 178A, § 4 (only one voting share per stockholder; limited ability to transfer stock), and § 10 (payment of stockholder dividends permitted only with express approval of PPB and commissioner).

We agree generally with statements contained in a letter, dated April 28, 2000, sent to SBLIC from the acting general

---

[16]It is true, of course, that treating the present value of the special policyholder dividends as a liability acts to reduce the amount of surplus available to be distributed as regular policyholder dividends. This result does not render the deduction improper.

[17]We note that, according to SBLIC, beginning on January 1, 2001, the National Association of Insurance Commissioners required that items such as the unpaid additional dividends be removed from surplus and reported as a liability.

counsel of the division of insurance, on behalf of the commissioner, in response to an inquiry by SBLIC regarding the proper method of calculating its permitted safety fund. Although not expressly approving or disapproving SBLIC's calculations, the commissioner had this to say regarding the proper financial accounting method for SBLIC's safety fund limit: "It is appropriate that each insurance company [perform the safety fund calculations] for itself, taking into account applicable statutory accounting principles, including existing statutes, regulations and any particular statutory or regulatory requirements prescribed or permitted which may apply in the case of any individual domestic life insurer. Accordingly, while SBLIC is subject to the financial accounting provisions contained throughout G. L. c. 175, it must also take into account the specific requirements of both [G. L.] c. 178A and the [p]lan approved thereunder." We find it instructive that the commissioner (who is charged with the responsibility of ensuring that SBLIC is in compliance with insurance laws and regulations), has not objected to its safety fund calculations nor instructed SBLIC to use another method of calculation.[18]

4. We conclude that the two deductions claimed by SBLIC conform to requirements set forth in G. L. c. 178A and G. L. c. 175, and to the plan, and are, therefore, permitted. The grant of partial summary judgment is affirmed. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

---

[18]The plaintiffs devote a considerable portion of their brief to issues not before this court, such as (1) attacking the dollar amounts used by SBLIC in calculating its surplus; and (2) asserting that SBLIC has abused its power by (a) deliberately avoiding paying out dividends owed to policyholders, in pursuit of a new "mission" (other than its sole statutory purpose) to increase the value of SBLIC stock owned by its board of directors; (b) devising various accounting schemes to avoid reporting its assets in direct response to this lawsuit; (c) purposefully retaining far more surplus than it can use.

Whether SBLIC has, in fact, correctly calculated its surplus and its safety fund, are factual matters still to be litigated (or, perhaps, agreed on) in further proceedings in the Superior Court. The plaintiffs' numerous allegations of misconduct on the part of SBLIC rely on documents that, although a part of the summary judgment record, are not relevant to the legal issues we are asked to consider.