Gants, Ralph D., J.
In the seven years since this case has been filed, other judges of this Court have addressed four motions for partial summary judgment brought by the defendant Savings Bank Life Insurance Company of Massachusetts (“SBLIC”), one motion brought by the plaintiff class of SBLIC policyholders, and a cross motion brought by the defendant Commissioner of Insurance (“Commissioner”). One of those decisions was reported to and affirmed by the Supreme Judicial Court. Goldstein v. Savings Bank Life Ins. Co. of Mass. 435 Mass. 760 (2002). This Court now addresses four additional motions:
1. SBLIC’s Fourth Motion for Partial Summary Judgment, which contends that the claims in Counts II (breach of implied covenant of good faith and fair dealing) and VII (violation of G.L.c. 93A) are barred by the business judgment rule;
2. SBLIC’s Motion for Relief from Alleged Stipulation Concerning Deferred Annuity and Supplemental Contracts, and Plaintiffs’ Cross-Motion for a Declaration Binding SBLIC to its Admissions and Stipulations that It Has Only Participating Business, which addresses whether this Court should enforce a purported stipulation entered into by SBLIC that declared that deferred annuity contracts and supplemental contracts held by SBLIC are “participating polic(ies)” under G.L.c. 175, §140;
3. Plaintiffs’ Renewed Motion for Summary Judgment on Count XII of their Fourth Amended Complaint, with renewed cross-motions by SBLIC and the Commissioner, which considers whether the Commissioner abused her discretion in authorizing SBLIC to maintain a Safety Fund in excess of the twelve percent limit established under G.L.c. 175, §140 by the amount of SBLIC’s “net admitted deferred tax asset,” and
4. SBLIC’s Motion for Resolution of Dispositive Safety Fund Calculation Issues (which is at it sounds).
This Court conducted a day-long hearing on February 3, 3006 as to all these motions.[3] This Court will consider these four motions together because many of the issues they present overlap.
BACKGROUND
This Court assumes that the parties are familiar with the history of this case and will not here review that history. However, it is nonetheless valuable to incorporate into this opinion the background that the Supreme Judicial Court believed to be “helpful” when it resolved two outstanding issues in this case:
In 1992, the Massachusetts savings bank life insurance (SBLI) system, devised by Louis D. Brandeis, adopted in 1907 (St. 1907, c. 561), and later codified at G.L.c. 178 (repealed by St. 1990, c. 499, §22), was replaced, pursuant to G.L.c. 178A (inserted by St. 1990, c. 499, §23), by a new system of savings bank life insurance. DiBiase v. Commissioner of Ins., 428 Mass. 755, 755-56 (1999). Under the reorganization, the individual insurance departments of savings and insurance banks that comprised the SBLI system were replaced by a single domestic stock life insurance company, SBLIC. See G.L.c. 178A, §2. SBLIC assumed all assets, including any surplus, rights, and interests; and all of the obligations and liabilities of the insurance departments of the former savings and insurance banks. See G.L.c. 178A, §7.
To the savings and insurance banks, the Legislature directed that shares of SBLIC capital stock be issued:
in such proportion as the surplus of the insurance department of each such bank... bears to the total surplus of the insurance departments of all such banks as of the date of conversion, or in such other manner deemed to be fair and equitable by the directors and approved by the commissioner.
G.L.c. 178A, §4. Each bank was to designate one of its directors or trustees to be an incorporator of SBLIC and to serve as a director of the company. See G.L.c. 178A, §3. Regardless of its proportion of stock ownership, each bank was to have only one voting share. See G.L.c. 178A, §4.
To the individual policyholders under the SBLI system as of the date of conversion, the Legislature directed that an amount equal to the total surplus assumed by SBLIC be distributed, over time, as additional annual dividends (special policyholder dividends). See G.L.c. 178A, §5. According to §5, distribution was to be made:
over a period of not less than eight nor more than twelve years in accordance with a schedule prepared by [SBLIC] and approved by the commissioner [of insurance] and shall continue until the sum so distributed equals the amount of said surplus on said date of conversion.
The distributions were to be made without interest, except that in the year following the payment of the final dividend, an additional payment amount was to be paid representing one year’s interest on the total distributions. Id. In addition, the Legislature directed that “[t]he amount of surplus so distributed shall be considered as an expense in determining the net profits of [SBLIC].” Id.
The Legislature established a policyholders protective board (PPB) (consisting of seven members appointed by the Governor from policyholders of savings bank life insurance) to review the financial operations of SBLIC and make recommendations to the directors to ensure SBLIC’s ability to offer “safe, low cost insurance.” G.L.c. 178A, §9. The Legislature provided that no dividends may be paid to the stockholder savings banks without the approval of the PPB and the Commissioner of Insurance (commissioner). G.L.c. 178A,§10.
*206 The Legislature specifically designated that the details of the reorganization were to be carried out in accordance with a plan, to be submitted by SBLIC to the commissioner. See G.L.c. 178A, §4 (“Within forty-five days after the establishment of [SBLIC], the directors shall submit to the commissioner a plan pursuant to which [SBLIC] shall assume the ownership and operation of the insurance department of each savings and insurance bank”). On receipt of the plan, the commissioner was to issue notice and hold a public hearing within forty-five days, after which, if she “determine[d] that the plan of assumption conforms to the requirements of [G.L.c. 178A], [she] shall approve said plan and issue to the company the certificate required by [G.L.c. 175, §32,] to be effective as of the close of business on [December 31, 1991].” G.L.c. 178A, §6. Such a plan was submitted and approved by the commissioner, after notice and a public hearing, in conformance with the statute. See DiBiase v. Commissioner of Ins., 428 Mass. 755, 759 (1999). The plan outlined the operating strategy for the conversion and included, among other matters, a method for valuation of each bank’s contribution to the total assumed surplus, to ensure the fair distribution of SBLIC capital stock, as mandated by §4, and a schedule for distribution of the special policyholder dividends, as mandated by §5 . . .
In addition to the statutoiy requirements of G.L.c. 178A, SBLIC, as a domestic stock insurance company, must conform to requirements contained in G.L.c. 175. See G.L.c. 178A, §2 (SBLIC “shall have all the rights, powers and privileges and be subject to all the duties, liabilities and restrictions of a domestic stock insurance company established under [G.L.c. 175], except as otherwise provided herein”). The following two provisions of G.L.c. 175 are relevant to the issues we are asked to decide.
Section 140 requires eveiy domestic life insurance company, including SBLIC, to ascertain and distribute its surplus (or profits) to policyholders annually. Specifically, §140 provides that each company:
[A]fter providing from the funds attributable to its participating business for the reserve required by [§§9 and 11] and all other liabilities attributable to such business, including dividends declared upon the capital stock, if any, and such sum as may be held on account of existing deferred dividend policies, and providing also for a contingency reserve not in excess of the limit prescribed in [§141], apportion its remaining funds attributable to such business upon the contribution to surplus plan, as dividends, to all other policies entitled to share therein.
Not all of the surplus, however, must be so distributed. Section 141 permits an insurer to retain from its surplus attributable to its participating business “as a safety fund, an amount not in excess of twelve per cent of its reserve for such business . . . provided that for cause shown, the commissioner may . . . permit any company to accumulate and maintain a safety fund in excess of the limit above mentioned.” Under G.L.c. 175, §§140 and 141, thus, SBLIC is permitted to retain from its surplus funds a contingency reserve or safety fund, equal in amount to no more than twelve per cent of its reserve funds. Anything over that amount is required to be distributed to policyholders in an annual dividend (unless the commissioner, for cause shown, has permitted accumulation in excess of this amount).
Goldstein v. Savings Bank Life Ins. Co. of Mass, 435 Mass. at 762-66.
DISCUSSION
As observed by the Supreme Judicial Court, G.L.c. 175, §141 permits SBLIC (and eveiy other domestic life insurance company) to accumulate and hold in a Safely Fund the “surplus funds or profits” attributable to its participating insurance business. G.L.c. 175, §141. See Goldstein, 435 Mass. at 765. Section 141, however, limits the amount of money that may be accumulated and held by SBLIC and other life insurance companies in that Safely Fund to twelve percent of its reserve for its participating insurance business, unless the Commissioner, “for cause shown,” authorizes SBLIC (or another life insurance company) to keep more than twelve percent of its reserve in the Safely Fund. G.L.c. 175, §141. See Goldstein, 435 Mass. at 765-66. Stated differently, under Section 141, if SBLIC at the end of its fiscal year has earned any “surplus funds or profits,” it may transfer these “surplus funds or profits” to its Safety Fund provided the amount in its Safety Fund does not exceed twelve percent of its reserve. Once the twelve percent threshold has been reached in its Safety Fund, whatever “surplus funds or profits” that remain must be returned to its policyholders in additional dividends unless the Commissioner specifically authorizes it to keep a greater amount in the Safety Fund “for cause shown.” The essence of the plaintiffs’ claims in this litigation, however framed, is that they have been denied their statutoiy entitlement to the “surplus funds or profits” beyond the amount that lawfully may be retained in the Safety Fund monies in 2000, 2001, and 2002.[4] SBLIC’s contention that the plaintiffs have no standing to enforce this statutory entitlement has essentially been rejected by the various courts that have heard this case over the last seven years, because the case would have been dismissed long ago had any court believed that the plaintiffs could not obtain judicial enforcement of this statutoiy entitlement if it were indeed violated.
SBLIC contends that it owes nothing to the plaintiffs under this statutory entitlement, and presents three independent grounds for this contention. First, *207 it contends that, applying the appropriate accounting principles, it never exceeded the twelve percent threshold in the Safety Fund in any year in question. Second, it contends that, if the Safety Fund did exceed that threshold in either 2001 or 2002, it still had no obligation to pay the excess to policyholders because the Commissioner in a December 30, 2002 letter had authorized SBLIC to maintain a Safety Fund in excess of the twelve percent limit by the amount of SBLIC’s “net admitted deferred tax asset,” which was greater than any alleged excess. (Letter from Commissioner to Robert Sheridan, President & Chief Executive Officer, SBLIC, Dec. 30, 2002.) Third, SBLIC contends that Section 141 itself authorizes SBLIC to keep any reserve in excess of the twelve percent limit provided it does not add any money to the Safety Fund so as to further increase that overage. This Court will address here only the second and third arguments, in reverse order.
SBLIC’s Third Argument in Defense of the Plaintiffs’ Claim
This Court will address and reject SBLIC’s third contention because it reflects a misunderstanding of the histoiy of the SBLIC legislation and the language of Section 141. Section 141 provides in pertinent part:
Any domestic life insurance may from its surplus funds or profits attributable to its participating business accumulate and hold, or hold if already accumulated, as a safety fund, an amount not in excess of twelve per cent of its reserve for such business, or one hundred thousand dollars, whichever is greater,... provided that in cases where the existing surplus or safety fund ... exceeds the limit above designated, the company shall be entitled to retain said surplus or safety fund, but shall not be entitled to add thereto so long as it exceeds said limit. . .
G.L.c. 175, §141. This language, with exceptions not relevant here,[5] was enacted in 1907, when Savings Bank Life Insurance was first created by the Legislature at the urging of then-attorney Louis Brandéis.[6] It is plain from the background and legislative histoiy of that original legislation that one of the concerns meant to be addressed by savings bank life insurance was the excessive retention of reserves by life insurance companies, benefitting the companies’ shareholders but not their policyholders.
Brandeis’s focus was on eliminating the wasteful and exploitive industrial life insurance available in the late nineteenth and early twentieth centuries. Alpheus Thomas Mason, Brandeis: A Free Man’s Life 153, 305 (The Viking Press 1946). Industrial life insurance was “sold by house-to-house solicitors working only in the poorer districts. Its premiums [were] collected by agents in person, and in cash, sometimes under duress. Being fixed for all ages at five cents or multiples thereof, the premiums ... [were] so large as compared with the incomes of the insured, that the lapse ratio of industrial policies [was] extraordinarily high.” Id. “This distribution and collection system, together with the high lapse rate, made industrial life insurance veiy expensive.” Raymond A. Guenter, Bank Insurance Powers—Yesterday, Today and Tomorrow, 17 Ann. Rev. Banking L. 351, 374 (1998). “This was . . . not insurance but exploitation.” Mason, supra, at 153.
In December 1906, Brandéis wrote that
the present system under which the workingmen obtain life insurance involves an appalling sacrifice of their hard-earned savings ... In the fifteen years ending December 31, 1905, the workingmen of [Massachusetts] paid to the so-called industrial life insurance companies an aggregate of $61,294,887 in premiums, and received back only an aggregate of $21,819,606. The insurance reserve arising from these premiums still held by the insurance companies does not exceed $9,838,000. It thus appears that, in addition to interest on invested funds, about one-half of the amount paid by the workingmen in premiums has been absorbed in the expense of conducting the business and in dividends to the insurance companies’ stockholders ... Of the more than $40,000,000 thus lost to the workingmen of a single State in fifteen years, the amount which has gone into dividends to stockholders of the insurance companies is comparatively small ... By far the greater part of the loss to the workingman is due to the extraordinarily wasteful system under which the business is conducted.
Alfred Lief, The Social and Economic Views of Mr. Justice Brandeis 360-61 (The Vanguard Press, Inc. 1930), quoting Bankers’ Magazine, December 1906. The abuses he found in the life insurance industry led Brandéis to wonder, “How many wage-earners would insure in these [existing insurance] companies if they were told that for eveiy dollar they pay, forty cents will go to the stockholders, officers’ and agents’ salaries, or for other running expenses?” Id. at 349-50, quoting Brandeis’s speech to Commercial Club of Boston, Oct. 26, 1905.
Brandéis proposed that:
In order to get rid of the abuses, the . . . changes must be fundamental. [Among those suggested were:] . . . the recognition of the true nature of the life insurance business; namely, that its sole province is to manage temporarily with absolute safety and at a minimum cost the savings of the people deposited to make appropriate provision in case of death, and that since its province is mainly to aid persons of small means, it should be conducted as a beneficent, not as a money-making, institution.
Id. at 350 (alteration in original) (emphasis added), quoting Brandeis’s speech, supra. With reform, Brandéis wrote, “the yearly tribute of the workingmen to . . . stockholders of dividends equivalent to 219.78 percent on the capital actually paid into the company, *208 the yearly waste of millions in lapsed policies, in fruitless solicitation and in needless collections, will cease.” Id. at 358-59, quoting Collier’s Weekly, Sept. 15, 1906.
Brandéis understood that reform of the existing system of insurance would be futile; the best option, he believed, was for savings banks to issue insurance policies. Id. at 359. Savings banks, he wrote,
have no stockholders, being operated solely for the benefit of the depositors. They are managed by trustees, usually men of large business experience and high character, who serve without pay, recognizing that the business of collecting and investing the savings of persons of small means is a quasi-public trust, which should be conducted as a beneficent, and not as a money-making institution. The trustees, the officers, and the employees of the savings banks have been trained in the administration of these savings to the practice of the strictest economy.
Id. at 359-60, quoting The Independent, Dec. 20, 1906. Further, “(t]hese savings banks . .. employed no solicitors, paid no agents’ commissions. Why should insurance companies impose on policyholders an expense so unnecessary?” Mason, supra, at 155.
The 1907 legislation that Brandéis inspired actually contained two separate Safety Fund caps: a ten percent cap for the newly-created SBLI, G.L.c. 178, §21,[7] and a twelve percent cap for all other domestic life insurance companies. G.L.c. 175, §141. The twelve percent Safety Fund cap applied to savings bank life insurance only as a result of SBLIC’s reorganization in 1992, when G.L.c. 178 was repealed and replaced by G.L.c. 178A, which expressly made SBLIC subject to the provisions of G.L.c. 175. G.L.c. 178A, §2. As a result of the reorganization, G.L.c. 175, §141, which originally applied only to domestic life insurance companies other than SBLIC, now applies to SBLIC, setting the Safely Fund cap at twelve percent of SBLIC’s reserve. G.L.c. 175, §141.
The two Safety Fund caps embodied Brandeis’s vision that a life insurance company should not be permitted to hoard the money of its policyholders for the benefit of the company itself and its shareholders. Specifically, “(t]his unique provision was inserted in the law because Mr. Brandéis . . . believed that the piling up of enormous surplus by life insurance companies was entirely unnecessary after adequate insurance reserves had been provided for.” Alice H. Grady, Brandéis Savings Bank Insurance A Great Success, Boston Sunday American, circa 1915, Exhibit 8 to the Plaintiffs’ Memorandum in Support of Their Motion for Summary Judgment on Count XII of Their Fourth Amended Complaint, at 2.
SBLIC’s interpretation of G.L.c. 175, §141 focuses on the italicized and bolded language reprinted below:
Any domestic life insurance may from its surplus funds or profits attributable to its participating business accumulate and hold, or hold if already accumulated, as a safety fund, an amount not in excess of twelve per cent of its reserve for such business, or one hundred thousand dollars, whichever is greater, . . . provided that in cases where the existing surplus or safety fund. . . exceeds the limit above designated, the company shall be entitled to retain said, surplus or safety fund, but shall not be entitled to add thereto so long as it exceeds said limit
G.L.c. 175, §141 (emphasis added). SBLIC interprets this language to mean that a life insurance company during an extraordinarily profitable year may increase its Safety Fund well beyond the twelve percent threshold (for example, to twenty percent) and hold it at twenty percent of reserve indefinitely as long as it did not increase the percentage in future years to, say, twenty-one percent. For all practical purposes, this interpretation would gut the twelve percent threshold, because every life insurance company could increase that threshold in a profitable year and then continue that higher threshold (albeit not add to it) into the indefinite future. The question this Court must ask is: why would the Legislature set a threshold and then create an exception that would effectively negate it?
SBLIC’s answer to this question, unsupported by any evidence (and stated more bluntly by the Court than by SBLIC’s attorneys), is that the Legislature essentially enacted a compromise in which it appeared to provide the policyholders the benefit of the twelve percent limit but, through this exception, it actually gave life insurance companies, for all practical purposes, a higher limit. In contrast to this rather cynical interpretation, the plaintiffs offer a less cynical interpretation that finds substantial support in the language of the legislation itself and is more consistent with the apparent spirit and intent of the reform legislation. Focusing on the use of the word “existing” (bolded above), the plaintiffs contend that the Legislature meant simply to ease the transition into this new requirement for life insurance companies already doing business in Massachusetts that had accumulated a higher percentage of reserves. Stated differently, the word “existing” meant existing in 1907 when the legislation was enacted, not “existing” in any subsequent year. Under this interpretation, if a life insurance company in 1906 had accumulated surplus or a Safety Fund equal to twenty percent of its reserve, it was not required in the first year to distribute the percentage in excess of the threshold but it could not add to that twenty percent in future years.
The plaintiffs’ interpretation is far more consistent with the language of G.L.c. 175, §141. Under that provision, each year, a life insurance company must determine its reserve, which effectively determines the maximum size of its Safety Fund, which may not *209 exceed twelve percent of that reserve. At the end of the fiscal year, when the amount of surplus funds or profits are determined, the life insurance company may transfer all or some of those surplus funds or profits to its Safety Fund, provided the Safety Fund remains at or below the twelve percent of reserve threshold, unless the Commissioner has approved a higher threshold. Any amount of surplus funds or profits beyond that twelve percent must be distributed to policyholders in accordance with G.L.c. 175, §140. Therefore, unless the Commissioner approved a higher threshold for the Safety Fund, there never could be “an existing . . . safety fund” that exceeded the twelve percent threshold, because no amount beyond twelve percent of the reserve could have been transferred to the Safety Fund. If the Commissioner had approved a higher threshold, for instance, to twenty percent of reserve, under the original legislation enacted in 1907, that higher threshold applied only to the particular year of the approval and could not, without subsequent approval, be carried over into another year. See St. 1907, c. 576, §77 (“the insurance commissioner may at any time and from time to time permit any corporation to accumulate and maintain a safely fund in excess of the limit above mentioned, for a prescribed period not exceeding one year in any one permission”) (emphasis added). Under SBLIC’s interpretation, this time limitation on the Commissioner’s approval would also be gutted, because the life insurance company, in my example, could continue to maintain the Safety Fund at the twenty percent threshold indefinitely without subsequent approval from the Commissioner.
Moreover, it is noteworthy that, when the Legislature in 1907 established SBLI for the first time, it did not include a provision similar to that italicized above regarding the “existing surplus or safety fund” in G.L.c. 178, §21, which established the ten percent cap on the SBLI Safety Fund (and is quoted in full at note 7 infra). The obvious reason is that, when this legislation was first enacted, there was no existing SBLI surplus or safety fund, because there was no SBLI. Therefore, the fair inference from the inclusion of that language in G.L.c. 175, §141 and its omission in G.L.c. 178, §21 is that it referred to the surplus or safety fund existing at the time of the legislation in already-existing life insurance companies.
As the Supreme Judicial Court wrote in Champigny v. Commonwealth:
We construe a statute in accord with “the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated,” Telesetsky v. Wight, 395 Mass. 868, 872-73 (1985), quoting Commonwealth v. Galvin, 388 Mass. 326, 328 (1983), and to avoid imputing a “(b)arrenness of accomplishment,” Plymouth County Retirement Ass’n v. Commissioner of Pub. Employee Retirement, 410 Mass. 307, 312 (1991), quoting Selectmen of Topsfield v. State Racing Comm’n, 324 Mass. 309, 314 (1949) . . . “We will not adopt a literal construction of a statute if the consequences of such construction are absurd or unreasonable. We assume the Legislature intended to act reasonably.” Attorney Gen. v. School Comm. of Essex, 387 Mass. 326, 336 (1982). “[W]hen a literal reading of a statute would be inconsistent with legislative intent, we look beyond the words of the statute.” Id. “The object of all statutory construction is to ascertain the true intent of the Legislature from the words used. If a liberal, even if not literally exact, interpretation of certain words is necessary to accomplish the purpose indicated by the words as a whole, such interpretation is to be adopted rather than one which will defeat that purpose.” Lehan v. North Main St. Garage, 312 Mass. 547, 550 (1942).
422 Mass. 249, 251 (1996). When faced with the choice between a cynical interpretation that would significantly diminish the apparent legislative purpose of the statute and a more honorable, pragmatic interpretation that respects the legislative language and purpose but softens the financial impact of the transition, this Court will choose the latter. This Court does not believe that the Legislature in 1907 intended that, in the next century, a life insurance company could accumulate more than twelve percent of its reserve in its Safety Fund and, without the authorization of the Commissioner, fail to pay that excess to its policyholders.
SBLIC’s Second Argument in Defense of the Plaintiffs’ Claim
Having rejected SBLIC’s third argument, this Court will now consider its second argument, which focuses on the lawfulness of the authorization given by the Commissioner to SBLIC to maintain a Safely Fund in excess of the twelve percent limit by the amount of SBLIC’s “net admitted deferred tax asset,” which was greater than any alleged excess. This is the subject of Plaintiffs’ Renewed Motion for Summary Judgment on Count XII of their Fourth Amended Complaint, with the renewed cross motions by SBLIC and the Commissioner.
Before considering this motion, it is important to note that it originally was considered by Judge Margot Botsford in her Memorandum and Order dated December 8, 2004, as well as her further memorandum dated February 17, 2005. Judge Botsford ruled that the plaintiffs were entitled to judicial review of the Commissioner’s decision and that the standard of review is “for error of law or abuse of discretion, as measured by the arbitrary and capricious test.” Memorandum and Order, Dec. 8, 2004, at 12, quoting *210 Sierra Club v. Commissioner of the Dep’t of Envt’l Mgmt., 439 Mass. 738, 748-49 (2003). She twice declined to decide whether the Commissioner’s decision was indeed arbitrary and capricious because SBLIC contended that, even with the net admitted deferred tax asset, its Safety Fund for 2001 and 2002 fell below the twelve percent threshold, and no showing had yet been made that the Commissioner’s decision caused the plaintiffs any harm. See Memorandum and Order, Dec. 8, 2004, at 12-13; Further Memorandum and Order, Feb. 17, 2005, at 2. All the parties, however, urge this Court to decide this issue, largely because it is easier to resolve this issue than the host of other issues that would need to be resolved to determine whether the inclusion or exclusion of the net admitted deferred tax asset in the Safety Fund will have legal consequence. In short, the parties reason that, if the Commissioner’s decision is upheld and the net admitted deferred tax asset is not included in the Safety Fund calculation, the plaintiffs will not be able to prevail in showing that SBLIC exceeded the twelve percent threshold even if it were to prevail on all the remaining outstanding accounting issues. If these so-called DTAs must be included in the Safely Fund calculation, then those lesser accounting issues will become ripe for resolution by the Court. Since the parties agree that the resolution of this issue may hasten the final resolution of this already aged case, this Court, with some reluctance, agrees to decide the issue deferred by Judge Botsford.
Before addressing whether the Commissioner’s decision was arbitrary and capricious, it is important to define that standard of review. The Supreme Judicial Court in Sierra Club noted that this standard of review is appropriate when a public official, like the Commissioner, exercises “broad discretion.” 439 Mass. at 748. A discretionary decision is arbitrary and capricious when it lacks a rational basis. Id. As explained in Sierra Club, “The process by which the information is gathered, identified, and applied to the statutory standards . . . must be logical, and not arbitrary or capricious.” Id. at 749. In determining whether the Commissioner lacked a rational basis in her exercise of discretion, this Court must be mindful that appropriate deference must be given to the anticipated expertise of the Commissioner in the field of insurance, since she is obliged by statute to “administer and enforce” the Commonwealth’s insurance laws. See G.L.c. 175, §3A; see also Colby v. Metropolitan Prop. & Cas. Ins. Co., 420 Mass. 799, 806 (1995) (“[T]he commissioner’s interpretation of the relevant statutes, although not controlling, is entitled to deference”). “These principles of deference, however, are not principles of abdication.” Nuclear Metals, Inc. v. Low-Level Radioactive Waste Mgmt. Bd., 421 Mass. 196, 211 (1995). If the Commissioner’s exercise of discretion is illogical and without rational basis, and cannot reasonably be reconciled with the governing legislation, her decision must be rejected. See id.; see also Colby v. Metropolitan Prop. & Cas. Ins. Co., 420 Mass. at 806.
In reviewing the Commissioner’s decision, it is necessary to consider it in the context of other statutory obligations that she is obliged to “administer and enforce.” By March 1 of the following year, every insurance company is required to file with the Commissioner an annual statement of financial condition as of December 31 of the previous year. G.L.c. 175, §25.[8]
Such annual statement shall be made on the latest applicable form of annual statement approved by the National Association of Insurance Commissioners appropriate to the several kinds of companies, with any additional information the commissioner may require for filing with the National Association of Insurance Commissioners for the purpose of eliciting a complete and accurate exhibit of the condition and transactions of the companies. All financial information reflected in the annual statement shall be maintained and prepared in accordance with accounting practices and procedures prescribed or permitted by the commissioner. The commissioner shall require that the annual statement be maintained and prepared in accordance with the Annual Statement Instructions and Accounting Practices and Procedures Manual adopted by the National Association of Insurance Commissioners unless further modified by the commissioner as [s]he considers appropriate. The annual statement shall be subscribed and sworn to by its president and secretary or, in their absence, by two of its principal officers. The Commissioner may at other times require any such statements as [s]he may deem necessary.
G.L.c. 175, §25.
Effective January 1, 2001, the National Association of Insurance Commissioners (“NAIC”) amended its Accounting Practices and Procedures Manual to incorporate the newly adopted Codification of Statutory Accounting Principles (“the Codification”). In a Bulletin issued on October 24, 2001, the Commissioner informed all Massachusetts insurance companies that the Codification enhancements “should be used for all financial reporting after January 1, 2001.” (Bulletin 2000-18 “Codification of Statutory Accounting Principles,” Oct. 24, 2000.)
Under SSAP No. 4 of the Codification, which established “the definition of an ‘asset’ for use in statutory accounting and established] the criteria for consistent treatment of nonadmitted assets,” an asset was defined as “probable[9] future economic benefits obtained or controlled by a particular entity as a result of past transactions or events.” SSAP No. 4, ¶¶1 & 2. According to SSAP No. 4, an asset “has three essential characteristics:
a. it embodies a probable[10] future benefit that involves a capacity, singly or in combination with other assets, to contribute directly or indirectly to future net cash inflows,
b. a particular entity can obtain the benefit and control others’ access to it, and
*211 c. the transaction or other event giving rise to the entity’s right to or control of the benefit has already occurred.
SSAP No. 4, ¶2. An asset may be admitted or nonadmitted. Id. SSAP No. 4 goes on to explain:
As stated in the Statement of Concepts, “The ability to meet policyholder obligations is predicated on the existence of readily marketable assets available when both current and future obligations are due. Assets having economic value other than those which can be used to fulfill policyholder obligations, or those assets which are unavailable due to encumbrances or other third party interests should not be recognized on the balance sheet,” and are, therefore, considered nonadmitted. For purposes of statutory accounting principles, a nonadmitted asset shall be defined as an asset meeting the criteria in paragraph 2 above, which is accorded limited or no value in statutory reporting, and is one which is:
a. Specifically identified within the Accounting Practices and Procedures Manual as a non-admitted asset; or
b. Not specifically identified as an admitted asset within the Accounting Practices and Procedures Manual.
SSAP No. 4, ¶3.
Under SSAP No. 10, financial statements must recognize deferred income tax assets (DTAs) in accordance with that Statement. SSAP No. 10 provides:
Gross DTAs shall be admitted in an amount equal to the sum of:
a. Federal income taxes paid in prior years that can be recovered through loss carrybacks for existing temporary differences that reverse by the end of the subsequent calendar year;
b. The lesser of:
i. The amount of gross DTAs, after the application of [the above paragraph a], expected to be realized within one year of the balance sheet date; or
ii. Ten percent of statutory capital and surplus as required to be shown on the statutory balance sheet of the reporting entity for its most recently filed statement with the domiciliary state commissioner adjusted to exclude any net DTAs, EDP equipment and operating system software and any net positive goodwill; and
c. The amount of gross DTAs, after application of [paragraphs a and b above], that can be offset against existing gross DTLs.
SSAP No. 10, ¶10. When one considers SSAP Nos. 4 and 10 in conjunction, it emerges that, for all practical purposes, a net admitted deferred tax asset is included as an asset in an insurance company’s financial statement only when the president and secretary of the insurance company affirm that it is a readily marketable asset that is available to pay both current and future obligations due within the next calendar year. If the net deferred tax asset cannot be used to fulfill policyholder obligations, or if it may be unavailable to pay these obligations because of some future contingency, then it is a nonadmitted DTA, not an admitted DTA. Indeed, in 2001, SBLIC declared in its financial statement $34,382,985 in federal and foreign tax recoverables, plus interest thereon, but $11,001,114 were declared to be nonadmitted assets and therefore not included as assets for purposes of the Safely Fund. Only the remaining $23,381,871 was declared to be admitted federal and foreign tax recoverables, plus interest thereon.
When SBLIC requested the Commissioner to increase its maximum Safety Fund under G.L.c. 175, §141 “by the amount of its net admitted deferred tax asset," it declared, “We consider this to be a ‘paper asset’ unavailable for use to pay claims or dividends.” (Letter from Peter Lyons, SBLIC Senior Vice President and General Counsel, to Commissioner, Dec. 4, 2002.) This statement is inconsistent with the general definition of an admitted asset and the specific definition of a net admitted deferred tax asset, because a DTA is admitted only if it is readily available to pay claims or dividends in the next calendar year.
This same error found its way into the Commissioner’s decision dated December 30, 2002, which granted SBLIC’s request for 2001 and 2002. She justified her decision by stating that these net admitted deferred tax assets, comprised of federal and foreign income tax recoverables and interest on these recoverables, “are not liquid, and are not otherwise immediately available for the payment of policyholder claims, dividends, etc.,” and therefore “it is reasonable to permit SBLI to maintain a safely fund in excess of the limit outlined in §141 by the amount of that net admitted deferred tax asset.” Commissioner’s Decision, Dec. 30, 2002. In other words, although SBLIC affirmed in its financial statement that these net admitted deferred tax assets were to be realized in the next calendar year, the Commissioner declared that they were nonetheless not available to pay policyholder claims and dividends in the next calendar year, and therefore were not to be included in the Safety Fund. The practical consequence of her decision was to permit SBLIC to maintain admitted assets in its Safety Fund that potentially could exceed by $23.4 million (the amount of its net admitted deferred tax assets that year) the twelve percent cap imposed by §141.
Not only is the Commissioner’s decision inconsistent with the definition in the Codification of an admitted asset and a net admitted deferred tax asset, but it is also logically internally inconsistent. If the Codification had truly erred by including as an admitted asset a type of asset that was not reliably available in the next calendar year to pay insurance claims, thereby effectively reducing the permitted twelve percent cushion in the Safety Fund, then she logically should have revised her Bulletin *212 2000-18 by adopting the Codification except for the provisions regarding net admitted tax deferred assets. However, she has never revised her Bulletin 2000-18 by excluding the Codification provisions regarding net admitted DTAs.[11] If there was no inherent problem with the inclusion of net admitted DTAs but instead specific insurance risks that SBLIC was likely to face in the next calendar year that could render its reserve inadequate, even with the twelve percent Safety Fund, then she logically would have identified those particular concerns and declared why, in view of the special circumstances faced by SBLIC, an increase in its reserve by the amount of its net admitted DTAs was appropriate. However, the Commissioner never was presented with any information to indicate that SBLIC would have the slightest problem in meeting its insurance obligations in the next two calendar years, and she did not present any such special need as her reason for granting SBLIC this two-year period of relief. Indeed, 2002 was nearly over when she declared her decision for 2001 and there was no evidence that SBLIC was having any difficulty that year in meeting its insurance obligations for 2001 or that the anticipated net admitted deferred tax assets were not, in fact, being collected. In short, if there was a policy flaw in the method of accounting, she should have addressed that problem as a matter of policy. If there was no policy problem, but a special need faced by SBLIC in two calendar years, then she should have identified that special need. She did neither.
SBLIC and the Commissioner argue that her decision had a rational basis because the net admitted DTAs were not “liquid” in the same way as stocks and bonds, and therefore deserved to be excluded. SBLIC, however, included many assets on its financial statement that were not “liquid” in the samé way as stocks and bonds, including real estate, mortgage first liens on real estate, and policy loans. All of these assets can be sold, but not immediately. To be sure, these assets may be used as collateral on loans as they awaited liquidation, but so, too, could net admitted DTAs that were to be recovered from tax authorities in the next calendar year.
This Court recognizes that the Legislature gave the Commissioner considerable discretion to permit an insurance company to exceed the twelve percent limit of the Safely Fund, but it also recognizes that this discretion was limited by the need to show cause for granting the exception and to articulate that cause in writing. See G.L.c. 175, § 141. This Court also recognizes that the Commissioner has a responsibility to ensure the financial integrity of life insurance companies, and to ensure that the reserves will be adequate to pay all claims, even unanticipated claims. See Maryland Cos. Co. v. Commissioner of Ins., 372 Mass. 554, 563 (1977). Yet, this Court also recognizes that the Legislature enacted the twelve percent Safety Fund threshold for a reason, and was entitled to expect that its reason for setting that threshold would not be pushed aside without a rational justification. The Commissioner has failed to articulate any rational justification for increasing SBLIC’s Safety Fund in 2001 and 2002 by the amount of its net admitted DTAs; her explanation is inconsistent with the definition of an admitted asset and her conduct in granting a two-year exemption but not declaring a policy change is logically inconsistent with her erroneous explanation. For these reasons, this Court finds that her December 30, 2002 decision to permit SBLIC to maintain a Safely Fund in excess of the twelve percent limit by the amount of its net admitted tax deferred assets for 2001 and 2002 was arbitrary and capricious, without rational basis, and therefore null and void.
This Court recognizes that, as a result of this decision, it will need to address various other Safety Fund calculation disputes that may determine whether or not SBLIC in fact did exceed the twelve percent limit in the years in question. Since there was not time to hear argument as to these disputes, a further hearing date will be set to address these questions as to the appropriate methodology to be used in calculating the assets in the Safety Fund. There are, however, other issues addressed in the four motions for summary judgment that this Court can resolve now to narrow the range of issues that remain before the Court.
SBLIC’s Motion for Summary Judgment as to the Claims of Breach of the Implied Covenant of Good Faith and Fair Dealing, and of Violations of Chapter 93A
1. Allegations that SBLIC Unfairly Retained Funds in the Safely Fund Below the Twelve Percent Threshold
In Judge Botsford’s Memorandum and Order on Defendant SBLIC’s Second Motion for Partial Summary Judgment, dated December 2, 2004, she accepted “the proposition that insurance contracts, like every other kind of contract, contain an implied covenant of good faith and fair dealing.” Decision, Dec. 2, 2004 at 8. She explained:
The scope of SBLIC’s obligations under that covenant, however, is not as broad as the plaintiffs suggest, for several reasons. First, one must take into account §§ 140 and 141. The SBLIC has “permission” to maintain a safety fund of up to 12 percent of its reserve.
. . . While conduct on the part of SBLIC that might amount to a bad faith manipulation of its safely fund for purposes of advancing unfairly the financial interests of the company’s stockholders at the expense of its policyholders may implicate the implied covenant,
. . . absent a showing of this type of conduct, the twelve percent maximum set out in §141 appears to create in effect a safe harbor for SBLIC with respect to any safely fund SBLIC maintains that is equal to or less than this maximum percentage (which may be increased by the commissioner).
Second, a violation of the implied covenant of good faith and fair dealing involves conduct that... is in fact in bad faith — or at least evidences an affirmative lack of good faith . . . An allegation or even proof *213 simply that the company has retained surplus beyond what might be deemed “necessary” for the business, or in excess of what other life insurance companies have retained does not constitute breach of the implied covenant. Similarly, a claim or proof that the company has retained surplus above what some might deem “reasonable,” by itself, is not sufficient.
Id. at 9-11 (citations and footnote omitted).
In an earlier decision, Judge Botsford had dismissed those counts of the plaintiffs’ complaint that rested on the legal premise that SBLIC owed a fiduciary duty to its policyholders, finding that “the relationship between an insurance policyholder and the insurance company is not fiduciary in nature.” Memorandum and Order on Defendant’s Motion to Dismiss, Aug. 8, 2003, at 7. She declared:
The fact that such companies have a statutory duty to distribute no less than a designated percentage of their surplus to policyholders does not automatically mean they owe a fiduciary duty to their policyholders, and does not by itself serve as the basis on which to make such a claim... The complaint does not contain any allegations of special circumstances of representation and reliance that might form the basis of a fiduciary obligation apart from the statutory obligations that SBLIC is bound to meet.
Decision, Aug. 8, 2003, at 6 (citation omitted).
The plaintiffs contend that Judge Botsford, in her earlier decisions in this case, established as the law of the case that the plaintiffs can prove that SBLIC breached the common-law implied covenant of good faith and fair dealing, or committed an unfair or deceptive act or practice in trade or commerce in violation of Chapter 93A if they prove that SBLIC acted in bad faith when it made various decisions that benefitted shareholders at the expense of policyholders. This Court reads both her learned decisions and the case law far more narrowly. This Court finds that the plaintiffs can prevail in establishing that SBLIC violated Chapter 93A by breaching the common-law implied covenant of good faith and fair dealing or by committing an unfair or deceptive act or practice in trade or commerce only if they prove that SBLIC failed to act in good faith in honoring the policyholders’ statutory entitlement under G.L.c. 175, §§140 and 141 to receive the surplus funds or profits that exceeded the amount permitted in the SBLIC Safely Fund — twelve percent of its reserve (or, alternatively, a greater amount authorized by the Commissioner). Stated more bluntly, for the plaintiffs to prevail, they will need to prove thatSBUC acted in bad faith to “manipulate the numbers” or “cook the books” to reduce the surplus funds or profits below the twelve percent threshold in a manner contrary to NAIC Accounting Practices and Procedures Manual and the newly adopted Codification, or in bad faith failed to pay out to policyholders the properly accounted amount in excess of the twelve percent threshold. The plaintiffs appear to contend that an insurance company’s obligation to act in good faith and to deal fairly with its policyholders means that a court may scrutinize any decision made by an insurance company that is alleged not to be made in good faith or to be unfair to its policyholders. In fact, “(t]he implied covenant of good faith and fair dealing provides ‘that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.’ ” Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471-72 (1991), quoting Drucker v. Roland Wm. Jutras Assocs., 370 Mass. 383, 385 (1976), and Uproar Co. v. National Broad. Co., 81 F.2d 373, 377 (1st Cir.), cert. denied, 298 U.S. 670 (1936). Stated differently, when there is a contractual right or, as here, a statutory entitlement that effectively is incorporated into a contractual right benefitting policyholders, a party to that contract (here, the insurance company) may not act unfairly or in bad faith to deprive a policyholder of the fruits of that contractual right (here, the right to receive his proportionate share of the Safely Fund in excess of twelve percent of the reserve).
Policyholders have no right, neither statutory nor contractual, to receive monies from the Safety Fund below this twelve percent threshold. Indeed, Judge Botsford correctly found that the statutory scheme essentially provided a “safe harbor” to insurance companies who chose to retain the full twelve percent of reserves in their Safety Fund. In the absence of a right, contractual or statutory, to reserves below the twelve percent threshold, SBLIC cannot be found in breach of the implied covenant of good faith and fair dealing for failing to pay these monies to policyholders, because policyholders cannot be denied the fruits of contractual rights unless they have such contractual rights. Similarly, while “conduct ‘in disregard of known contractual arrangements’ and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes,” Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. at 474, quoting Wang Labs., Inc. v. Business Incentives, Inc., 398 Mass. 854, 857 (1986), neither a breach of the implied covenant of good faith and fair dealing nor a Chapter 93A violation that rests on a breach of the implied covenant of good faith and fair dealing can stand in the absence of a contractual right whose benefits are being unfairly denied.
Therefore, to the extent that many of the plaintiffs’ allegations in the counts alleging breach of the implied covenant of good faith and fair dealing and of Chapter 93A focus on SBLIC’s decision to retain reserves below the twelve percent threshold but beyond its legitimate need for such surplus, summary judgment must be granted as to these allegations because policyholders have no right to any Safety Fund monies that, under the governing accounting rules, fall within the twelve percent threshold. This is the “safe harbor” described by Judge Botsford.
*214 2. Allegations that SBLIC Made Decisions that Reduced the Size of the Safety Fund
The plaintiffs have also alleged a great number of business decisions by SBLIC that have had the effect of reducing the amount of surplus funds or profits and thereby diminishing (or eliminating) the amount in excess of twelve percent of reserves that must be paid to policyholders under G.L.c. 175, §§140 and 141. Among these decisions are:
1. SBLIC established an “incentive compensation plan” that rewarded SBLIC executives for decisions that had the effect of reducing policyholder dividends;
2. SBLIC attempted to “bum up” its surplus by geographic expansion, setting unnecessarily large reserve amounts, investing in higher risk securities, and taking aggressive loss write-offs; and
3. SBLIC declared in 2002 that its annuity and supplemental contracts were nonparticipating policies whose profits were no longer allocated to the surplus that may be paid to policyholders as dividends under G.L.c. 175, §140.
To prove that any of these decisions constitute a breach of the implied covenant of good faith and fair dealing, the plaintiffs must prove that SBLIC acted in bad faith by unfairly denying policyholders benefits that were guaranteed to them by known contractual arrangements. See Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. at 474. There was, however, no contractual arrangement that obliged the SBLIC to maximize the amount of surplus funds or profits or to avoid corporate decisions that might ultimately reduce the size of the Safety Fund. Nor, as Judge Botsford has already ruled, does SBLIC have a fiduciary relationship to its policyholders that otherwise imposes upon it these obligations. Therefore, to the extent that the plaintiffs are alleging that SBLIC breached the implied covenant of good faith and fair dealing by making business decisions in bad faith that had the consequence of reducing the overall size of the Safety Fund, SBLIC is entitled to summary judgment as this allegation.
The plaintiffs fare no better by bringing this allegation under Chapter 93A, although the analysis is somewhat different. The Supreme Judicial Court has stated “that the following are ‘considerations to be used in determining whether a practice is to be deemed unfair: (1) whether the practice ... is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) .. . is immoral, unethical, oppressive, or unscrupulous; (3) . . . causes substantial injury [to] . . . competitors or other businessmen.’ ” Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 778 (1986), quoting PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975), quoting 29 Fed. Reg. 8325, 8355 (1964). In this case, the only established concept of unfairness is that policyholders are entitled under G.L.c. 175, §141 to receive surplus funds orprofits beyond the amount permitted in the SBLIC Safely Fund — twelve percent of its reserve — and SBLIC may not act in bad faith to deny them this statutory entitlement. There is no established concept of unfairness that addresses whether corporate decisions unfairly favor shareholders over policyholders. Nor should courts lightly open the door to Chapter 93A claims by policyholders alleging that their insurance company, through one of the countless decisions made by that company, has somehow acted unfairly towards them.
Courts are poorly positioned to adjudicate claims that particular decisions have unfairly favored one corporate interest over another for at least three reasons. First, there is no clear judicial rule or standard as to the appropriate balance that should be reached among the competing interests in a corporation, so it is difficult to serve as the arbiter as to whether the corporation has acted fairly towards them. Second, to serve as such an arbiter, the court would need to learn a great deal about the background and basis of the decisions in question, which would require the court to develop an expertise nearly equivalent to those managing the corporation, without the benefit of the experience of those managers. Third, the time and effort that would be devoted to litigate such questions of fairness would often weigh down the corporation, especially if the litigation lingers for years and reduces the corporation’s ability to plan ahead and move forward.[12]
In view of these considerations, this Court has examined the evidence surrounding the SBLIC decisions challenged as unfair by the plaintiffs to determine whether, viewed in the light most favorable to the plaintiffs, there is a genuine issue of material fact that must be resolved at trial as to whether SBLIC acted in bad faith to favor shareholders or other corporate interests over policyholders by reducing the potential size of the Safely Fund. The first two sets of decisions identified above at page 27 fail to raise a genuine issue of material fact. These are quintessential business judgments that are routinely made by an insurance company, and there is no evidence suggesting that they were made in bad faith, with the intent to reduce the Safely Fund without otherwise benefitting the corporation. Moreover, there is no evidence in the summary judgment record that shareholders have received an unreasonable amount during the relevant period in shareholder dividends which have unreasonably or unfairly reduced the amount of surplus in the Safety Fund available to policyholders. Furthermore, any shareholder dividend was approved in accordance with G.L.c. 178A §10 by the SBLIC Policyholders Protective Board, of whose seven members three are policyholders who are directors, officers, or employees of savings bank shareholders in SBLIC and four are policyholders who are not so affiliated. See G.L.c. 178A, §§9 & 10.
The third SBLIC decision — treating its annuity and supplemental contracts as nonparticipating policies— poses a closer question, because this Court is satisfied that SBLIC has stipulated that, for purposes of this litigation, all such contracts are to be treated as *215 participating policies. Therefore, with this stipulation, the plaintiffs fairly can contend that SBLIC in 2002 began treating these contracts as nonparticipating policies even though it stipulates that they were participating policies. SBLIC asks this Court to relieve it of this stipulation, no doubt because it recognizes the inherent problems that it poses as to whether SBLIC acted in good faith when it treated these participating policies as nonparticipating in calculating its surplus.
This Court declines to relieve SBLIC of this stipulation eight years into this litigation, but it turns out to have no consequence with respect to the Chapter 93A claim. The reason why it has no consequence is that all parties agree that, if these annuity and supplemental contracts were treated as participating policies, their inclusion would reduce the amount in the Safety Fund for each of the relevant years (which is, I expect, why SBLIC was willing to enter into the stipulation initially). Therefore, even assuming for the sake of argument that SBLIC acted unfairly and in bad faith by treating these participating policies as nonparticipating, it did not deny the policyholders any money in excess of the twelve percent threshold that they would be entitled to receive. In short, this decision to treat arguably participating policies as nonparticipating did not damage the plaintiffs, because their contractual rights are limited to the receipt of monies in excess of the twelve percent threshold in the Safety Fund and this decision, if undone, would not have generated an additional penny due to the plaintiffs from the Safety Fund under G.L.c. 175, §141.
For these reasons, this Court finds that SBLIC is entitled to summary judgment as to the claim in Counts II that it breached the implicit covenant of good faith and fair dealing that it owed to its policyholders and as to the claim in Count VII that it committed unfair or deceptive acts or practices in trade or commerce against its policyholders in violation of Chapter 93A.
ORDER
For the reasons stated above, this Court ORDERS as follows:
1. SBLIC’s Fourth Motion for Partial Summary Judgment, which addresses the claims in Counts II (breach of the implied covenant of good faith and fair dealing) and VII (violation of G.L.c. 93A), is ALLOWED. Partial summary judgment is granted as to Counts II and VII.
2. SBLIC’s Motion for Relief from Alleged Stipulation Concerning Deferred Annuity and Supplemental Contracts is DENIED, and Plaintiffs’ Cross Motion for a Declaration Binding SBLIC to its Admissions and Stipulations that It Has Only Participating Business is ALLOWED.
3. Plaintiffs’ Renewed Motion for Summary Judgment on Count XII of their Fourth Amended Complaint is ALLOWED. This Court finds that the Commissioner’s decision dated December 30, 2002 that authorized SBLIC to maintain a Safety Fund in excess of the twelve percent limit established under G.L.c. 175, §141 by the amount of SBLIC’s “net admitted deferred tax asset” was arbitrary and capricious and an abuse of her discretion, and is null and void. The cross motions for summary judgment by the SBLIC and the Commissioner are DENIED.
4.As to SBLIC’s Motion for Resolution of Dispositive Safety Fund Calculation Issues, this Court declares thatG.L.c. 175, §141 does not authorize SBLIC to keep any surplus funds or profits in its Safety Fund in excess of the twelve percent limit, even if it does not add any money to the Safety Fund so as to further increase that overage. In the absence of authorization by the Commissioner (which this Court has ruled here is null and void), SBLIC is required to pay to policyholders any reserve in its Safety Fund in excess of the twelve percent limit established by G.L.c. 175, §141.[13]

There was not time, however, to reach certain of the less important Safety Fund calculation issues.

The parties entered into a stipulation on November 4, 2002 in which the plaintiffs agreed not to pursue their earlier allegations that SBLIC had reserves in excess of twelve percent in its Safety Fund during the period 1992 through 1999.

For instance, in 1960, the Legislature revised this statute to limit the Safety Fund to surplus funds “attributable to its participating business.” St. 1960, c. 568, §2.

“Brandeis was devoted ... to the preservation of what he considered traditional New England business ethics. In April 1905, some Brahmins who held policies of New York insurance firms became concerned by the financial scandals in the Equitable Life Insurance Society of New York, and they approached Brandéis to protect their interests. He responded by forming the New England Policy-Holders’ Protective Committee, acting himself as unpaid counsel.” Allon Gal, Brandéis of Boston 96 (Harvard University Press 1980).

As noted above, prior to SBLIC’s 1992 reorganization, G.L.c. 178 governed SBLIC’s operations. Section 21 of the G.L.c. 178 provided that:
Savings and insurance banks shall annually set apart as a surplus from the net profits, if any, which have been earned in the insurance department, an amount not less than twenty nor more than seventy-five per cent thereof, until such fund equals ten per cent of the net insurance reserve, or the amount of the special insurance guaranty fund, whichever is the greater. Such surplus fund shall thereafter be maintained and held to meet losses in its insurance department from unexpectedly great mortality, depreciation in its securities or otherwise. The balance of the net profits shall be distributed equitably annually among the holders of its policies and annuity contracts: such distribution to be made in the discretion of the trustees either in cash or by addition to the amounts payable under the policies or annuity contracts.
St. 1907, c. 561, §21 (emphasis added): see St. 1907, c. 561, §§3-5 (providing for creation of guaranty funds).

For those insurance companies whose fiscal year differs from the calendar year, the annual statement may be filed 60 days after the end of the fiscal year, with the approval of the Commissioner. G.L c. 175, §25.

SSAP No. 4, citing the FASB Statement of Financial Accounting Concepts No. 6, Elements of Financial Statements, states that the word “probable” “is used with its usual general meaning, rather than a specific accounting or technical sense . . ., and refers to that which can reasonably be expected or believed on the basis of available evidence or logic but is neither certain nor proved.” SSAP No. 4, at n.l.

The word “probable” is given the same meaning as in note 9 infra.

judge Botsford observed that she was “stymied as to why the commissioner granted the permission for 2001 and 2002, since she appears to have resisted the full-blown policy determination sought.” Memorandum and Order, Dec. 8, 2004 at 13 n.10.

SBLIC has argued that it may not be held liable for these decisions under the business judgment rule. Generally, the business judgment rule is applied when a shareholder derivatively sues corporate directors and/or officers for making business decisions that were not in the best interests of the shareholders. In such cases, it is “a complete defense” that the director or officer performed his duties “in good faith and in a manner he reasonably believes to be in the best interests of the corporation, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.” G.L.c. 156B, 865.
While the business judgment rule generally applies only when officers or directors are the defendants, it is properly applied here to these claims because the policyholders are challenging corporate decisions made by SBLIC’s directors and officers. See G.L.c. 175, §30(a)(2) (applying “provisions of the Business Corporation Law, chapter one hundred fifty-six B [including §65] ... to incorporated domestic stock companies”); G.L.c. 178A, §2 (providing that SBLIC “shall have all the rights, powers and privileges and be subject to all the duties, liabilities and restrictions of a domestic stock insurance company established under the provisions of chapter one hundred and seventy-five”). Pragmatically, insurance companies make many business decisions, and each will have an impact that may favor or disfavor shareholders, bondholders, directors, officers, employees, policyholders, and the general public. See G.L.c. 156B, §65 (“In determining what he reasonably believes to be in the best interest of the corporation, a director may consider the interests of the corporation’s employees, suppliers, creditors and customers, the economy of the state, region and nation, community and societal considerations, and the long-term and short-term interests of the corporation and its stockholders ...”). When these decisions are made in good faith and in a manner reasonably believed to be in the best interests of the corporation, and with such care as an ordinarily prudent person in a like position would use under similar circumstances, they may not be overturned in a court of law. See id.
It is not easy, however, to apply the business judgment rule to a claim, as here, of a violation of the implied covenant of good faith or of an unfair or deceptive act or practice in violation of Chapter 93A. Under G.L.c. 156B, §65, the “complete defense” of the business judgment rule applies only when the directors and officers of the corporation performed their duties:
1. in good faith and in a manner [they] reasonably believe[d] to be in the best interests of the corporation, and
2. with such care as an ordinarily prudent person in a like position would use under similar circumstances.
See id. (emphasis added). In essence, for the business judgment rule to provide a complete defense, the director and officer must act both in good faith and without negligence.
However, to establish a violation of the implied covenant of good faith or of an unfair or deceptive act or practice in violation of Chapter 93A, it is not enough to establish negligence alone. As the name suggests, a violation of the implied covenant of good faith and fair dealing requires a showing that SBLIC failed to act in good faith or to deal fairly with its policyholders, not simply that it failed to act towards them with reasonable care. See generally Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. at 471-76.
Nor is mere negligence sufficient to establish an unfair act or practice in violation of c. 93A. Walsh v. Chestnut Hill Bank & Trust Co., 414 Mass. 283, 288 (1993) (“ ‘[N]ot every negligent act is unfair or deceptive and thus unlawful under G.L.c. 93A, §2.’ ”), quoting Swanson v. Bankers Life Co., 389 Mass. 345, 349 (1983). “While G.L.c. 93A is a statute of ‘broad impact,’ Greenfield Country Estates Tenants Ass'n v. Deep, 423 Mass. 81, 88 (1996), . . . the limits of which are not precisely defined, Mechanics Nat'l Bank v. Killeen, 377 Mass. 100, 109 (1979), aviolation of G.L.c. 93A requires, at the very least, more than a finding of mere negligence ...” Darviris v. Petros, 442 Mass. 274, 278 (2004) (citations in original).
Therefore, in considering the consequence of the business judgment rule with claims alleging a violation of the implied covenant of good faith and fair dealing, and an unfair or deceptive act or practice in violation of Chapter 93A, the Court is left essentially with two choices: (1) it can find that the business judgment rule provides a “complete defense” only if SBLIC were to prove that it did not act negligently towards its policyholders, which is more than it would need to prove without the business judgment rule to defeat a claim of a breach of the implied covenant of good faith or fair dealing or a Chapter 93A claim, or (2) it can find that, for the plaintiffs to prevail, they must at least prove that the directors and officers of SBLIC failed to act “in good faith and in a manner [they] reasonably believe[d] to be in the best interests of the corporation" when they took actions that had the consequence of reducing the size of the surplus or the Safety Fund, which they would have to prove anyway to establish a breach of the implied covenant of good faith and fair dealing or a violation of Chapter 93A. Either way, the business judgment rule is of little, if any, consequence, because it would never provide a defense to conduct that would constitute a breach of the implied covenant of good faith and fair dealing of a violation of Chapter 93A.
The real significance of the business judgment rule is that it helps to define what corporate conduct may be deemed unfair or deceptive within the meaning of Chapter 93A. The spirit of the rule is that disinterested directors and officers are presumed to act “in good faith towards all the corporation’s members,” Harhen v. Brown, 431 Mass. 838, 844 (2000), quoting S. Solomont & Sons Trust v. New England Theatres Operating Corp., 326 Mass. 99, 113 (1950), and are given considerable latitude in determining how the corporation should best be managed. See Evangelist v. Fidelity Mgmt. & Research Co., 554 F. Supp. 87, 90-91 (D.Mass. 1982) (“The [business judgment] rule originated as a means of limiting liability of corporate officers and directors for mere mistakes or judgment errors so as to give them the latitude they need to run a corporation; courts will not second-guess their decisions if made honestly, in good faith and in pursuit of legitimate corporate purposes” (citing 3A Fletcher, Cyclopedia of the Law of Private Corporations, §1039 (perm. ed. 1975)). This Court is confident that its interpretation of the meaning of Chapter 93A as applied in this case comports with the spirit of the business judgment rule.

The parties will need to arrange with the Clerk of Court a date for further hearing as to the other Safety Fund Calculation Issues the Court was unable to reach at the last hearing, which may now prove dispositive in view of the decisions rendered here. The parties are urged to confer prior to such a hearing to explore the possibility of a settlement.